Joseph Carl **SHAW**, Appellant,

v.

Joseph R. **MARTIN**, Warden, Central Correctional Institution, and Hon. Daniel R. McLeod, Attorney General for South Carolina, Appellees.

No. 83–6272.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 9, 1984.

Decided April 26, 1984.

Stephen B. Bright, Atlanta, Ga. (John D. Delgado, Furr & Delgado, Kenneth M. Suggs, Suggs & Kelly, Columbia, S.C., on brief), for appellant.

Donald J. Zelenka, Asst. Atty. Gen., Columbia, S.C. (T. Travis Medlock, Atty. Gen., Columbia, S.C., on brief), for appellees.

Before WIDENER, PHILLIPS and SPROUSE, Circuit Judges.

WIDENER, Circuit Judge.

Shaw appeals the district court's judgment in favor of the South Carolina authorities on his petition brought for habeas corpus relief. We find no merit in Shaw's contentions, and affirm the judgment of the district court.

## Background

Shaw pleaded guilty as a principal[1] to armed robbery, kidnapping, criminal sexual conduct, two counts of conspiracy, and two counts of murder. The evidence at his sentencing hearing, conducted by the court without a jury as required by S.C.Code § 16–3–20(B), disclosed that after drinking beer and partaking of drugs, Shaw, James Terry Roach, and Ronald Eugene Mahaffey decided on October 29, 1977, in Mahaffey's words, to "see if we could find a girl to rape." The three drove to a baseball park northeast of Columbia, South Carolina, and pulled up beside a parked car occupied by 17-year-old Thomas Taylor and 14-year-old Carlotta Hartness. At a signal from Shaw, Roach leveled a .22-caliber rifle at Taylor and demanded money. Taylor gave the three his wallet. Shaw and Mahaffey got out of the car, and Mahaffey took the keys out of Taylor's car. Shaw ordered Miss Hartness out of the car and forced her into the back seat of his car with Mahaffey. Shaw got back into his car, turned to

---

**1.** Shaw pleaded guilty to the murders on the theory that the act of one is the act of all. This is South Carolina's formulation for principal liability. *See State v. Gilbert,* 107 S.C. 443, 446, 93 S.E. 125, 125–26 (1917).

Roach, and said, "OK, now." Roach then shot and killed Taylor as he sat in his car.

Miss Hartness was taken to a dirt road some distance away, was forced to disrobe, was raped once each by Roach and Mahaffey and twice by Shaw, and forced to perform oral sex by both Shaw and Mahaffey. Shaw then asked who would shoot Miss Hartness, and Roach volunteered. Shaw instructed Miss Hartness to put her face to the ground. When she refused and pleaded for her life, he drew a circle in the dirt, drew an X inside the circle, and told Miss Hartness to put her head in the circle. She again refused. Shaw told her a third time to put her head on the ground, and she complied. Roach then shot Miss Hartness in the head, and, according to Mahaffey's testimony, Shaw said Miss Hartness "wasn't dead yet" and took the rifle from Roach and again shot Miss Hartness in the head.

Shaw, Roach, and Mahaffey left Miss Hartness' body, disposed of the rifle and bullets, and returned to Taylor's car to satisfy themselves that Taylor was dead. Later that night, Shaw returned to the scene of Miss Hartness' killing and mutilated her body. *State v. Shaw*, 273 S.C. 194, 197–98, 255 S.E.2d 799, 800–01, *cert. denied*, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979).

After taking testimony on extenuation, mitigation, and aggravation, as required under S.C.Code § 16–3–20(B), the sentencing judge found that three of the statutory aggravating circumstances were present: murder was committed while in the commission of rape, murder was committed while in the commission of kidnapping, and murder was committed while in the commission of armed robbery. *See* S.C.Code § 16–3–20(C)(a)(1)(a), (c), (e). In mitigation, the judge found that Shaw had no significant history of prior criminal activity involving the use of violence against another person, that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and he considered the age or mentality of the defendant at the time of the crime as a mitigating factor. *See* S.C.Code § 16–3–20(C)(b)(1), (2), (6), (7). Finding that at least one of the statutory aggravating circumstances was present, that the death sentence was warranted under the evidence of the case, and that the death penalty was not the result of prejudice, passion, or any other arbitrary factor, all required findings under S.C.Code § 16–3–20(C), the judge entered sentences of death for Shaw on the murder charges.[2] The South Carolina Supreme Court affirmed on appeal; and, in its first mandatory review of a death sentence under the state's current death penalty statutes, *see* S.C.Code § 16–3–25, found that the sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor, that the evidence supported the judge's finding of a statutory aggravating circumstance, and that there were no similar cases against which the proportionality of Shaw's sentence could be compared. *State v. Shaw*, 273 S.C. at 209–11, 255 S.E.2d at 806–07. The United States Supreme Court denied certiorari on November 13, 1979. *Shaw v. South Carolina*, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979). The South Carolina Supreme Court, on November 21, 1979, directed that the sentence of death be executed. The execution was scheduled for December 14, 1979.

Shaw then commenced federal and state post-conviction proceedings, which we summarize here. Shaw filed in the district court a petition seeking a writ of habeas corpus and a motion for stay of execution on December 11, 1979, and a supplemental

---

**2.** On the conviction for armed robbery, Shaw received a sentence of 25 years' imprisonment, to be served consecutive to the other sentences; for kidnapping, no sentence; for criminal sexual conduct, a sentence of 30 years' imprisonment, to be served consecutive to the other sentences; and for the two charges of conspiracy, two sentences of 5 years' imprisonment each, to be served consecutive to the other sentences.

petition on December 12. The court held a hearing on December 12, and that day entered an order denying a stay. On December 13, 1979, a judge of this court granted Shaw a stay of execution. *Shaw v. Martin*, 613 F.2d 487 (4th Cir.1980). On December 13 Shaw also made an application for post-conviction relief in state court. That state court held extensive hearings from January 28, 1980 through February 6, 1980, and on February 7, 1980 denied relief. The South Carolina Supreme Court affirmed with formal opinion in *Shaw v. State*, 276 S.C. 190, 277 S.E.2d 140 (1981), and on April 24 set a new execution date of May 22, 1981. On the application of Shaw for a writ of mandamus directing the district court not to entertain application for modification or vacation of our previous stay entered December 13, 1979, this court granted the writ, reaffirmed the December 13, 1979 order of the single judge staying execution, and amended the stay to apply to the May 22 execution date and to any subsequent date pending further order of the court. *In re Shaw*, No. 81–1396 (4th Cir. May 15, 1981) (per curiam) (unpublished).[3]

Shaw then refiled his habeas corpus petition in the district court. The district court denied Shaw's motion that the judge recuse himself, and Shaw's motions for leave to take depositions and for the appointment of experts. The court held a hearing on the state respondents' motion for summary judgment on December 8, 1982, and granted this motion, denying further evidentiary hearings. The court entered judgment for the state respondents on December 22, 1982, and Shaw appealed. We deal with Shaw's contentions on appeal in the order in which they are raised in his brief.

## I. Bias and Prejudice of the District Judge

■ Shaw claims that the district judge should have recused himself because of prejudice and bias and that he thus denied Shaw a fair hearing. Alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). The nature of the bias must be personal rather than judicial. *United States v. Carmichael*, 726 F.2d 158, 160 (4th Cir.1984). On review, the question is whether the judge abused his discretion in denying a recusal motion. *Id.* And it is not an abuse of discretion if the complaint is merely based upon the judge's rulings in the instant case or related cases or attitude derived from his experience on the bench. *Id.* at 160–161.

■ Shaw moved that the district judge recuse himself under 28 U.S.C. §§ 144, 455, based on exchanges between the judge and Shaw's newly retained counsel (retained counsel) during the December 12, 1979 hearing on Shaw's motion for a stay of execution, and based on the judge's opinion in that matter. The facts Shaw depends upon to show that the district judge should have disqualified himself simply do not support the broad generalizations he makes about them.

We have read the entire transcript of the hearing on the request for a stay in the district court, and are of opinion that Shaw's complaint of constant interruption of his attorneys by the judge is simply without factual foundation. Likewise, the district judge taking notice that Shaw's trial attorney was an outstanding member of the bar recognized as such by his court and by him as a judge is entirely lacking in merit as a fact outside the record or a related proceeding or his experience on the bench from which bias or prejudice should be inferred.

---

**3.** During the pendency of this case, this court by orders also refused to vacate the stay mentioned in our per curiam opinion of May 15, 1981, *In re Shaw*, No. 81–1396 (4th Cir. July 20, 1981); dismissed an appeal by petitioner on July 30, 1981, *Shaw v. Martin*, No. 79–2390 (4th Cir. July 30, 1981); and dismissed a procedendo and mandamus action brought by a state respondent on December 20, 1982, *In re McLeod*, No. 82–2052 (4th Cir. Dec. 20, 1982).

The district court transcript shows that retained counsel had only come into the case the day before the hearing, that trial counsel was still representing Shaw, that retained counsel was unable to point to any facts in the record or an affidavit to support Shaw's claim, and that retained counsel's argument seemed illogical to the judge. Retained counsel himself apologized to the judge for not having the opportunity to present the facts in a more compelling fashion, and assured the judge that he understood the court's "concern that there may be an appearance of trying to fool with the court, or deceive the court." Nothing here warrants turning the judge's reaction to retained counsel's perhaps necessarily limited preparation into an attack on the judge's impartiality.[4] Considering the position retained counsel took at the hearing, the judge's admonition not to "fill the record with a whole lot of gobble-de-gook" is understandable, even if the colloquial language used by the judge was out of place in that formal setting.

The remainder of Shaw's claim of bias and prejudice rests primarily on the district judge's statements subsequent to denial of the recusal motion. There was, for example, what has now turned out to be an ill-advised attempt at humor in a remark about retained counsel's organization,[5] but the record as a whole does not establish prejudice against Shaw's claim or bias against Shaw that was personal and extrajudicial.[6] The judge therefore did not abuse his discretion in failing to disqualify himself, and Shaw was not denied a fair hearing in district court on that account.[7]

## II. Denial of an Evidentiary Hearing in the District Court

Shaw claims that he was improperly denied an evidentiary hearing in the district court. An evidentiary hearing in a federal habeas corpus proceeding on an issue of fact is mandatory only if the petitioner establishes one or more of the criteria mentioned in 28 U.S.C. § 2254(d) or in *Townsend v. Sain,* 372 U.S. 293, 312–18, 83 S.Ct. 745, 756–60, 9 L.Ed.2d 770 (1963). Otherwise, a state court's findings of fact are presumed to be correct. 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). Shaw claims he meets four of these criteria for essentially three reasons. He claims that he did not get a full and fair hearing and was otherwise denied due process in state court because of bias of the state habeas judge and extrajudicial influence upon the state sentencing judge; that he was unable to develop evidence of such bias adequately because he was not permitted to subpoena three state court judges; and that he has material facts as to dis-

---

4. Shaw also finds prejudice in the judge's question, "I assume there is nothing to say that the proceedings which were had before Judge Harwell were not due process? Not orderly and not voluntary on his part?" This claim is simply frivolous.

5. THE COURT: What organization do you belong to?
   . . . .
   MR. BRIGHT: The Southern Christian Defense Committee.
   THE COURT: That is not a subversive organization, is it?
   MR. BRIGHT: No, your honor.
   THE COURT: I always wondered. Go ahead.

6. The transcript of the December 12, 1979 hearing, for example, shows that upon the Defense Committee's attorney being introduced to the court he was greeted with: "Glad to have you."

7. Shaw also objects to the district court's adoption of large parts of the State's proposed opin-

ion granting summary judgment. The adoption of one party's proposed findings and conclusions is a practice with which we have expressed disapproval on a number of occasions. *See, e.g., Miller v. Mercy Hospital, Inc.,* 720 F.2d 356, 368–69 (4th Cir.1983); *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 639–42 (4th Cir.), *cert. granted on other grounds,* —— U.S. ——, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983). We have held, however, that adoption of proposed findings and conclusions will not warrant reversal of the cause per se. *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d at 641. We therefore proceed to examine the facts of this case and the legal consequences thereof with more "careful scrutiny" than that usually required. *See id.* In this connection we have satisfied ourselves that the state court fact-finding supports the judgment of the district court, and have not relied upon its opinion.

crimination in the imposition of the death penalty in South Carolina which were not adequately developed in state court. *See* 28 U.S.C. § 2254(d)(2), (3), (6), (7). We cannot agree that Shaw did not get a fair hearing in the state courts or that the taking of additional evidence was required on the bias and related issues, and we find the evidence offered to supplement the state record on discrimination in the application of the death penalty as it relates to the race of the victim and the decision of the prosecutor insufficient to warrant an evidentiary hearing.

## A. *Fairness of state proceedings*

In the state post conviction proceeding, Shaw sought to prove bias on the part of the state judge conducting the hearing (the habeas judge) and extrajudicial influence on the state judge who sentenced Shaw (the sentencing judge). Shaw offered affidavits of two lawyers and made offers of proof of their testimony that at or about the time of Shaw's sentencing hearing, the habeas judge had remarked in their presence that he and another judge (apparently a justice of the South Carolina Supreme Court) had already talked to the sentencing judge and told the sentencing judge that if he did not sentence Shaw to death that he would be holding court in Walhalla or a remote part of the State. One of these attorneys testified that the statement was made in a "joking" manner, the other said in an "off-handed" manner. The habeas judge denied making the remarks and refused to recuse himself, and, on the basis of special interrogatories to the sentencing judge, found that the sentencing judge had not been contacted by or influenced by anyone.

The Supreme Court of South Carolina, however, did not depend upon the denials of the habeas judge and the sentencing judge but assumed the truth of the factual allegations in arriving at its decision, making only supportive reference to the denials of the judges involved. Its fact-finding is supported by the record and the presumption of correctness under 28 U.S.C.

§ 2254(d) and *Sumner v. Mata* has not been overcome. Because the South Carolina Supreme Court assumed the truth of the factual allegations, no further evidence was necessary on the point. Its fact-finding follows just below:

Assuming the truth of the factual allegations, we think the only reasonable view of the facts alleged are that they indicate an attempt at levity to ease the tensions created by the magnitude of the case concerning Mr. Shaw, rather than any actual personal bias on the part of the judge. Neither of the judges who allegedly discussed the sentencing judge's assignments has any authority or ability to affect a judge's assignment. Under our State's Constitution, this authority rests exclusively with the Chief Justice. The attorneys to whom the statements were made were well-known to the judge as public defenders who are dedicating all of their talents and energies to the defense of others. It is totally unreasonable to conclude that a judge would make such a statement and thereby reveal actual improper conduct to the public defenders, if such actions had actually occurred. In fact, the affidavits belie the conclusion of actual personal bias or improper conduct. They indicate that the comments, if made, were made in a joking manner. The fact that a more reflective manner might have been used to ease the obviously sobering discussion is insufficient, under the facts of this case, to require the judge's disqualification.

Our conclusion is further supported by the denial of the hearing judge that he made the statement attributed to him, his denial of any personal bias or prejudice in this matter, and his affirmance that he could conduct a fair and impartial hearing. The fair and impartial manner in which the proceedings were conducted evidences a complete lack of any personal bias.

In view of the total lack of any reasonable basis for the charge of bias and prejudice on the part of the trial judge,

we conclude that he properly ruled on the motion to recuse.

Of course, the question of recusal of the judge who presided at the post conviction hearing was designed, ultimately, to reach the issue of whether the alleged statements adversely affected the ability of the sentencing judge to consider the matter in an unbiased manner. Alleged errors in the refusal to subpoena the sentencing judge in an attempt to develop prejudice on his part are of no consequence in view of the absence of proof that the nature of the statements, if made, were such as to create a likelihood that they adversely influenced him. There is no intimation that anyone contacted him for the purpose of influencing his decision. The alleged statements were admittedly, jokingly made, if made at all. The sentencing judge also denied any contact of the nature charged. We find the charges of bias and prejudice on the part of the trial judges in this case to be completely without foundation.

*Shaw v. State,* 276 S.C. 190, 193–194, 277 S.E.2d 140, 141–142 (1981). No claim is made that there was not a fair hearing in the South Carolina Supreme Court,[8] and we adopt its fact-finding quoted just above as our own.

B. *Discrimination in Death Penalty Imposition*

Shaw further contends that an evidentiary hearing is necessary because material facts as to the operation of the South Carolina death penalty statute were not ade-

quately developed in the state proceedings. In particular, he claims that he could show "arbitrariness and discrimination in the imposition of the death penalty in South Carolina," and made an offer of proof in the district court consisting of the deposition of a certain Dr. Raymond Paternoster dated October 8, 1983, taken in another case, and tables reflecting Dr. Paternoster's statistical analysis of 1,826 "offender events"[9] involving homicide and occurring in South Carolina from 1977, when the current death penalty statute was enacted, through 1981.

Shaw, who is white, offered no proof and makes no claim that the death sentence is imposed in South Carolina on members of any race or group more than on any other race or group, a primary concern of the Supreme Court as to discrimination in death penalty cases. *See Godfrey v. Georgia,* 446 U.S. 420, 439, 100 S.Ct. 1759, 1770, 64 L.Ed.2d 398 (1980) (Justice Marshall concurring); *Furman v. Georgia,* 408 U.S. 238, 249–51, 92 S.Ct. 2726, 2731–33, 33 L.Ed.2d 346 (1972) (Justice Douglas concurring); *id.* at 309–10, 92 S.Ct. at 2762–63 (Justice Stewart concurring); *id.* at 365–66, 92 S.Ct. at 2790–91 (Justice Marshall concurring).

He argues, rather, that the death penalty is more likely to be sought and imposed in South Carolina if a defendant has killed a white victim than if he has killed a black victim. In essence, he thus claims that the statute violates the Fourteenth Amendment's equal protection guarantee as so applied[10] and, more specifical-

---

**8.** The state Supreme Court justice mentioned in the lawyers' affidavits and testimony did not participate in the decision in *Shaw v. State,* the appeal of the state habeas proceeding, nor did the sentencing judge, who by this time was a member of the state Supreme Court. *See* 276 S.C. at 196, 277 S.E.2d at 143.

**9.** An "offender event" in the terminology of Dr. Paternoster is an encounter between one offender and one victim that results in homicide. Thus, because there were three offenders (Shaw, Roach, and Mahaffey) and two victims, six offender events occurred in this case.

**10.** This argument, mentioned in several recent courts of appeals decisions, generally has failed for various reasons. *See Adams v. Wainwright,*

709 F.2d 1443, 1449–50 (11th Cir.1983); *McCorquodale v. Balkcom,* 705 F.2d 1553, 1556 (11th Cir.1983); *Smith v. Balkcom,* 660 F.2d 573, 584–85 (5th Cir.1981), *modified,* 671 F.2d 858, 859–60 (5th Cir.) (per curiam), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 612–13 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). In other cases, courts may have required evidentiary hearings on such claims. The cases are not directly on point. *See Pulley v. Harris,* 692 F.2d 1189, 1197–99 (9th Cir.1982), *rev'd.* — U.S. —, 104 S.Ct. 871, 79 L.Ed.2d 29 (not deciding or mentioning the point except in passing in n. 4); *Ross v. Hopper,* 716 F.2d 1528, 1539 (11th Cir.1983); *Spencer v. Zant,* 715 F.2d 1562, 1578–83 (11th

ly, that South Carolina prosecutors are selectively or discriminatorily prosecuting murder defendants.[11] It is well established that proof of discriminatory intent or purpose is required to show a violation of the equal protection clause. Official action is rarely unconstitutional merely because it has a disproportionate impact. Unless a clear pattern as stark as that in *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), emerges, proof of impact alone is not sufficient. *Village of Arlington Heights v. Metropolitan Housing Development Corp,* 429 U.S. 252, 264–66, 97 S.Ct. 555, 562–64, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). We have held, for example, consistently with that principle that a mere percentage difference in arrests of blacks and whites for a given crime is insufficient to support a theory of racial discrimination in the enforcement of the law. *Butler v. Cooper,* 554 F.2d 645, 647 n. 6 (4th Cir.1977).

Dr. Paternoster's statistical tables here indicate that 4.2% of the killers of black victims have the death penalty imposed while 6.2% of the killers of white victims do, hardly significant figures when we consider that 95.8% of the killers of black victims do not have the death penalty imposed, and 93.8% of the killers of white victims do not.

■ Assuming that the Fourteenth Amendment's prohibition of selective or discriminatory prosecution of a defendant on the basis of an unjustifiable standard such as race, *see Oyler v. Boles,* 368 U.S. 448, 454–56, 82 S.Ct. 501, 504–06, 7 L.Ed.2d 446 (1962); *Yick Wo v. Hopkins,* 118 U.S. 356, 374–74, 6 S.Ct. 1064, 1073, 30 L.Ed.

220 (1886); *United States v. Duncan,* 598 F.2d 839, 869 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), also encompasses decisions to prosecute based on the race of the victim, proof of discriminatory intent or purpose also is necessary in equal protection claims such as these. This rule is particularly appropriate for scrutinizing prosecutorial discretion, which of necessity must be broad. *See United States v. Duncan,* 598 F.2d at 869.

Dr. Paternoster's study, however, was also insufficient as to this selective prosecution claim. First, the study compared sentences imposed for all homicides committed in South Carolina, and as a part thereof compared sentences imposed for homicides accompanied by another felony. Unless a homicide is murder and is accompanied by one or more statutory aggravating circumstances, however, the prosecutor has no discretion to seek the death penalty; and relatively few felonies qualify as statutory aggravating circumstances in South Carolina. The inclusion of cases in which the prosecutor had no discretion to seek a death sentence at all invalidates the conclusion of the study purporting to find fault with prosecutorial discretion in seeking death penalty.

More importantly, the study lacks statistical validity because it did not adequately compare murders of similar atrocity. Simply put, this study does not show a pattern of incidents where, for example, black and white young women of tender years have been kidnapped, raped, murdered, and mutilated and the prosecutor has prosecuted only the murderer of the white girl.[12]

Cir.), *rehearing en banc granted,* 729 F.2d 1293 (11th Cir.1984).

11. The subject has been mentioned, sometimes obliquely, in a few recent opinions. *See Pulley v. Harris,* — U.S. —, — – —, 104 S.Ct. 871, 885–86, 79 L.Ed.2d 29 (1984) (Justice Brennan dissenting); *Smith v. Balkcom,* 660 F.2d at 584 n. 30 (pattern and practice of Georgia prosecuting authorities to discriminate on grounds of race, sex, and poverty); *Spinkellink v. Wainwright,* 578 F.2d at 612 (prosecutors more likely to seek penalty when victim white).

12. Indeed, this is a major problem with the further analysis of apparently the same data described in Paternoster, *Race of Victim and Location of Crime: The Decision to Seek the Death Penalty in South Carolina,* 74 J.Crim.L. & Criminology 754 (1983). Dr. Paternoster did recognize the invalidity of comparing all homicides, and in this article restricted most of his analysis to 321 capital murders. *Id.* at 765. Even this article, however, does not sufficiently compare murders of similar atrocity. The table that seems to come closest to making such a

Moreover, this comparison does not take into account many other factors entering into prosecutorial discretion, such as the willingness of a defendant to plead guilty, or whether the prosecutor has sufficient evidence to prove a defendant guilty. As previously noted, the statistics also do not show percentage differences in white-victim cases and black-victim cases sufficient to raise an inference that the prosecutors are purposefully or intentionally discriminating in their decision to seek the death penalty. Paternoster claimed that race was a significant predictor of whether a prosecutor would seek the death penalty, but admitted that it was a worse predictor than others he deemed significant, namely, whether another felony accompanied the homicide, whether there was more than one victim, and whether a stranger was killed. Further, he admitted that these four factors together did not account for nine percent of the prosecutor's decisions to seek the death penalty. Perhaps most significantly, Dr. Paternoster was unable to say that his data revealed any purposeful or intentional discrimination on the part of the prosecutors seeking the death penalty. The proffered evidence would not have been of sufficient probative value on the issue of discriminatory intent to have required response, and no evidentiary hearing was therefore required. *See United States v. Duncan*, 598 F.2d at 869.

■ In sum, we wish to be explicit that we do not hold that death penalty sentencing must be proportionately sought after by the prosecutor or awarded by courts or juries on the basis of the race of the victim in order to pass a test of constitutional validity under the Eighth and Fourteenth Amendments, but only that Dr. Paternoster's proffered evidence is insufficient to establish the claims asserted here, assuming their validity for the purpose of argument only.

The Supreme Court has not upheld such a claim but has discussed the one much like it in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). There the opinion of the court (Justices Stewart, Powell, and Stevens) examined the quite similar, if not the same, proposition presented here. In *Gregg*, the prisoner's complaint was:

> ... that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

428 U.S. at 199, 96 S.Ct. at 2937.

The Court rejected the proposition in this language: "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of

comparison analyzes homicides in which there were multiple victims who were strangers to the offender, and this table (based on admittedly insufficient data) shows that in such homicides the prosecutor is 10% more likely to seek the death sentence if the victims were black. *See id.* at 771.

We note in passing at this point that in *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982),

*cert. denied*, —— U.S. ——, 103 S.Ct. 1802, 76 L.Ed.2d 367 (1983), the South Carolina court analyzed the five capital murder cases it had reviewed under the present law. It yet placed Shaw's atrocity in a class by itself, stating that a "comparable crime" of "unspeakable cruelty and mutilation" had yet to come before that court. 300 S.E.2d at 75.

offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg* at 199, 96 S.Ct. at 2937. And a footnote added:

> The petitioner's argument is nothing more than a veiled contention that *Furman* indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there has been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited. Such a system, of course, would be totally alien to our notions of criminal justice.

*Gregg* at 199, 96 S.Ct. at 2937.

■ Thus, it is tempting to say that a statute granting the prosecutorial discretion complained of here has previously been approved by the Court as it may involve a defendant, so, as applied to a victim, the same discretion would be without flaw. But that would overlook the fact that the complaint here is against the statute as applied, not as written, and more importantly we should not decide a constitutional question when a factual ground exists for our decision. *Ashwander v. T.V.A.*, 297 U.S. 288, 341, 347, 56 S.Ct. 466, 480, 483, 80 L.Ed. 688 (1936) (Justice Brandeis concurring). Thus, we decide only that the evidence sought to be introduced was insufficient to support the proposition for which it was offered.

### III. Validity of Guilty Plea

Shaw claims that he is entitled to relief because his guilty pleas were invalid. We cannot accept either theory on which he bases this claim.

#### A. Competence to Plead Guilty

■ Shaw claims that his guilty plea could not have been informed, intelligent, or voluntary because he was incompetent to make such a plea. He urges that the standard of competence to plead guilty should be different from the standard of competence to stand trial. This court's rule is that in order to show incompetence to plead guilty, a defendant must demonstrate that "his mental faculties were so impaired ... when he pleaded that he was incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of his plea." *United States v. Truglio*, 493 F.2d 574, 578 (4th Cir.1974). This standard parallels the standard the Supreme Court established in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), for competence to stand trial,[13] and we see no logical reason that the standards should be different for standing trial and pleading guilty.

■ Although there was testimony that Shaw abused drugs and alcohol, had been emotionally disturbed, and perhaps had latent schizophrenia, the psychiatrist that he called at trial explained in the post-conviction hearing that Shaw was not psychotic. This psychiatrist and also the State's psychiatrist testified that Shaw was competent to participate in the plea and sentencing proceedings, to assist his attorney in his defense, and in general to stand trial. In addition, the sentencing judge asked numerous questions, first of Shaw's trial counsel and then of Shaw, to test whether Shaw understood the charges against him and his constitutional rights, whether he

---

**13.** The standard for competence to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

understood the consequences of his plea, and whether he was acting voluntarily. In each instance, Shaw answered affirmatively. The record establishes unequivocally that Shaw was competent to stand trial and thus to plead guilty, and that he entered informed, intelligent, and voluntary pleas of guilty.

### B. *Ineffective Assistance of Counsel*

Shaw also claims that his guilty pleas were invalid because he received ineffective assistance of counsel in deciding to plead guilty. He claims that his trial lawyer failed to inform him before he pleaded guilty that the sentencing judge had voted for a statute permitting the death penalty while a member of the South Carolina Senate.

This claim was first raised in the state post-conviction hearing. There, Shaw stated in his petition that his lawyer failed to inform him as to the sentencing judge's remark that he had voted for the death penalty while in the state legislature. The uncontradicted testimony of Shaw's trial lawyer, however, was that "I knew that Judge Harwell had voted for the death penalty when he was in the General Assembly. That was told to Mr. Shaw...." Shaw did not testify, nor does there appear in the state record an affidavit, that his lawyer did not so inform him. The habeas judge made various findings of fact in support of his conclusion that Shaw had received effective assistance of counsel but made no specific finding as to what the lawyer had told Shaw. The judge did, however, review and reject as meritless the allegations of ineffective assistance of counsel upon which he did not specifically comment in his opinion.

Shaw appears not to have challenged this aspect of the state fact-finding either in the state Supreme Court or in the later federal court proceedings. In his appeal to the state Supreme Court, Shaw claimed that it was ineffective assistance of counsel for trial counsel to advise Shaw to plead guilty after the judge had made his remark. He did not, however, press his claim that he had not been informed of the remark. The state Supreme Court held that Shaw had received effective assistance of counsel, but also did not address this specific incident. In the habeas corpus proceedings in the district court, Shaw offered his affidavit that his trial lawyer had not informed him before he pleaded guilty that the sentencing judge was in favor of the death penalty. In argument before the district court, however, Shaw's recently retained counsel were unclear about what was told Shaw, and indeed seemed to indicate that Shaw had been told by his attorney about the sentencing judge's views.[14]

Although at the state post-conviction relief hearing there was no express fact-finding on this issue, a federal court under *Townsend v. Sain*, 372 U.S. 293, 314, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), could reconstruct a state court finding that Shaw's trial lawyer did tell him of the judge's vote in the state legislature, because of the uncontradicted evidence of Shaw's trial attorney and of the lack of evidence to the contrary, coupled with the findings exonerating the attorney. We need not go so far, however. Even if we assume that Shaw's counsel did not so inform him, we do not find ineffective assistance of counsel in this case.

■■■■■ We can infer no more from Shaw's claim than that his lawyer should have told him that the judge had previously voted for a statute permitting a judge or jury to impose a sentence of death in a proper case. This is no more sinister than

---

**14.** The relevant portion of the transcript, cited in Shaw's brief before this court, reads as follows:

> MR. BURR: In conversations with my client last night, an issue was raised as to whether or not Mr. King knew prior to the entry of a guilty plea, of judge—the trial judge's bias toward the death penalty.

> THE COURT: Was Mr. Shaw contending that he knows about the trial judge's bias?
> MR. BURR: Mr. Shaw contends that Mr. King so informed him. That is, I believe, your honor, a valid issue of fact.

the taking of the oath of office by a South Carolina judge. In swearing to exercise the duties of his office and preserve, protect, and defend the State Constitution, *see* S.C. Const. art. VI, § 5, every judge in South Carolina has agreed to be bound by the legislature's decision that the death penalty should be imposed in a proper case. Shaw could not have found a state judge to hear his case who was not so bound, and we cannot infer more from the judge's prior vote in the state legislature. One who has voted as a legislator in favor of a statute permitting the death penalty in a proper case cannot thereafter be presumed disqualified to hear capital cases as a judge or predisposed to give a death sentence in any particular case. See *Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (memorandum opinion of Justice Rehnquist), with respect to the disqualification of a judge, and the opinion of Judge Murnaghan in *Hutchins v. Woodard,* 730 F.2d 953 (4th Cir.1984), especially at 959–961, with respect to the disqualification of jurors. Failure to inform one's client of information about which such insignificant inferences can be drawn simply does not of itself establish ineffective assistance of counsel. In that respect, *Wyatt v. United States,* 591 F.2d 260, 267 (4th Cir.1979), is persuasive. In *Wyatt,* the failure, in a case in which a jury was waived, as here, to inform a client that the judge had presided at an alleged co-conspirator's trial was held not to be ineffective representation of counsel, but informed professional deliberation.

■■■ After a review of the state postconviction hearing transcript, which covers seven days of testimony, we believe that the historical facts established in the state court support the legal conclusion that Shaw received effective assistance of counsel. *See Knight v. Johnson,* 699 F.2d 162, 166 (4th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 112, 78 L.Ed.2d 113 (1983); *Marzullo v. Maryland,* 561 F.2d 540 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978). The record shows that the advice and decision of trial counsel to recommend that Shaw plead guilty followed a careful and thorough investigation, and was the product of their sound deliberation and judgment that Shaw's prospects were better with the sentencing judge than with a jury, especially considering the brutal and utterly sadistic facts of the case. The record does not establish error at all, much less "counsel[ ] error ... so flagrant that a court could conclude that it resulted from neglect or ignorance," *Marzullo v. Maryland,* 561 F.2d at 544, or that Shaw's attorneys did not perform at or above the "range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Shaw's claim that his pleas were invalid because of ineffective assistance of counsel therefore must fail.[15]

## IV. Proportionality Review

■■■ Shaw also challenges his sentence on the ground that the South Carolina Supreme Court improperly compared his case to other similar South Carolina cases to determine whether the death sentence given was proportionate. Although the court conducted such an inquiry and found no similar cases with which to compare Shaw's sentence, *State v. Shaw,* 273 S.C. 194, 211, 255 S.E.2d 799, 807, *cert. denied,* 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329

---

**15.** Shaw also claims that his trial counsel were constitutionally ineffective because they believed that a guilty plea would suppress much of the evidence of the murders and that guilty pleas to the charges of rape, robbery, and kidnapping would establish statutory aggravation and preclude further testimony on these crimes. We note that this was the first case under South Carolina's death penalty statute to reach that Supreme Court, and that counsel thus had little guidance on the statute's operation. We also note that the lawyers' judgment was correct insofar as it predicted that the evidence would not be as extensive if a jury trial were waived. For example, of the state's list of 72 or 73 witnesses who could testify at a full trial, only eight were called to testify for the State at the sentencing hearing. We do not view trial counsel's actions as resulting from anything but "informed, professional deliberation." *Marzullo v. Maryland,* 561 F.2d at 544.

(1979), he claims that the court under S.C. Code § 16–3–25(C)(3) should not limit its comparison to other cases under the new statute in which the death penalty is actually imposed. *See State v. Copeland,* 278 S.C. 572, 579–591, 300 S.E.2d· 63, 71–74 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1802, 76 L.Ed.2d 367 (1983). Although a comparative proportionality review may be a safeguard against arbitrarily imposed death sentences, it is not required under the Constitution, *Pulley v. Harris,* —— U.S. ——, ——, 104 S.Ct. 871, 880, 79 L.Ed.2d 29 (1984); see *Barfield v. Harris,* 719 F.2d 58, 61–62 (4th Cir.1983). With no intimation that there was any such error, this court may not issue a writ of habeas corpus on the ground that the South Carolina Supreme Court has made an error of state law. *Pulley v. Harris,* —— U.S. at ——, 104 S.Ct. at 874. Shaw's challenge to the South Carolina Supreme Court's sentence review is without merit.

## V. Judicial Sentencing

Shaw's final claim is that he was entitled under the Constitution to have a jury determine his sentence even though he pleaded guilty, and that the State violated his equal protection rights by denying him jury sentencing when defendants in South Carolina who do not waive a jury trial are sentenced by a jury.[16]

■ The Constitution does not give state criminal defendants the right to jury sentencing. The judgment of the Court and its plurality opinion in *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976), rejected this proposition in affirming a sentence of death imposed by a judge:

> This court has pointed out that jury sentencing in a capital case can perform an important societal function, ... but it

has never suggested that jury sentencing is constitutionally required (citation omitted).

■ As to Shaw's equal protection argument, he cites no authority that finds an equal protection violation in a state scheme such as this, which allows jury sentencing after jury trials and requires judicial sentencing after a defendant pleads guilty. States "have always enjoyed 'wide leeway in dividing responsibility between judge and jury in criminal cases.'" *Chaffin v. Stynchcombe,* 412 U.S. 17, 22, 93 S.Ct. 1977, 1980, 36 L.Ed.2d 714 (1973), *citing Spencer v. Texas,* 385 U.S. 554, 560, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967). After pointing out the virtues of both judge and jury sentencing, the Court stated that "nothing in the Due Process Clause of the Fourteenth Amendment intrudes upon that choice." 412 U.S. at 22, 93 S.Ct. at 1980. We think the Equal Protection Clause likewise is not violated.

We are thus of opinion to, and do, affirm the judgment of the district court. Our stay or stays of any state court orders giving effect to the sentence of the state court shall be, and they hereby are, dissolved.

AFFIRMED.

---

**16.** S.C.Code § 16–3–20 sets out sentencing procedures:

> (B) Upon conviction or adjudication of guilt of a defendant of murder, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable after the lapse of twenty-four hours unless waived by the defendant. If the trial jury has been waived by the defendant and the State, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before the court.