**UNITED STATES of America,**

v.

**Kemba Niambi SMITH, Defendant.**

No. CRIM.A.2:93CR162–11.
No. CIV. A. 2:97CV411–2.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 4, 1999.

Fernando Groene, Asst' U.S. Attorney, Office of the U.S. Attorney, Norfolk, VA, for US.

Gerald Thomas Zerkin, Gerald T.Zerkin & Associates, Richmond, VA, for Defendant.

## *ORDER*

DOUMAR, District Judge.

Petitioner, Kemba Niambi Smith (hereinafter "Smith"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. In her petition, Smith alleges the following: (1) her guilty plea was not knowing and voluntary; (2) the government breached the terms of her plea agreement; (3) her sentence was unlawful and excessive; (4) her sentence is illegal because it is based upon an unconstitutional distinction between crack cocaine and cocaine hydrochloride; (5) she received ineffective assistance of counsel; and (6) her defense lawyers were laboring under a conflict of interest.

Smith requests that the Court conduct an evidentiary hearing and she has submitted numerous interrogatory and other discovery requests. *See* Rule 6 & Rule 8, Rules Governing Section 2255 Proceedings. For the reasons set forth, Smith's motion is **DENIED**.

### I. Background

*Cocaine Ring*

Smith was a college student at Hampton University in Hampton, Virginia when she got involved in a drug ring that distributed cocaine and crack cocaine from New York City to the District of Columbia, Virginia, North Carolina, and elsewhere. Presentence Report ("PSR") ¶ 14; Detention Hearing Transcript ("Detention Tr.") 36. Smith was raised in a middle class family

in Richmond, Virginia. PSR ¶¶ 114–115. Smith's father is an accountant and her mother is a school teacher. *Id.* Smith enrolled as a freshman student at Hampton University in the fall of 1989. The following spring, in May of 1990, she met Peter Michael Hall (hereinafter "Hall") at a party. PSR ¶ 94. Hall was the principal leader of the cocaine network along with his brother, Wainsworth Marcellus Hall. Detention Tr. 36.

Hall had moved from the New York area to Hampton, Virginia in late 1988 or early 1989. PSR ¶ 18. Once there, Hall devised a scheme for transporting money and drugs along the eastern corridor. PSR ¶ 22. Hall recruited Hampton University students, most of whom were female, to serve as drug couriers. PSR ¶ 22. Typically, cars would be driven to New York City and would be met by Wainsworth Hall and other ring members. *Id.* The cars would be taken to another location, loaded with drugs in secret compartments, and then driven back south. *Id.* Once received, the drugs would be sold on the streets. PSR ¶ 14. Originally, cocaine was brought down from New York and sold in its powder form. By the spring of 1990, however, Hall began to cook the powder into cocaine base or "crack" cocaine and the distilled product would be sold. PSR ¶ 14; Guilty Plea Hearing Transcript ("Plea Tr.") 29. Money would be collected and sent to New York by way of drug courier. Detention Tr. 37. In New York, there would be an exchange of money for drugs, and the process would be repeated. Detention Tr. 37.

The cocaine network was profitable and generated at least $4,000,000 in receipts based on distribution of over 200 kilograms of cocaine. PSR ¶ 17. The remunerative rewards came at a high price to human life. Two murders were committed by members of the ring, and two co-conspirators were murdered. PSR ¶¶ 54, 64; Detention Tr. 37.

Smith was not a leader in the drug conspiracy, but her involvement was substantial. Detention Tr. 42; PSR ¶ 94. In fact, Smith obtained apartments for Peter Hall under false names, she flew to New York to drop off money, and she drove vehicles concealed with drugs from New York to North Carolina.[1] Sentencing Hearing Transcript ("Sentencing Tr.") 105–108; PSR ¶ 49; Detention Tr. 39–44. Also, Smith purchased a 1992 Jeep Wrangler in her name for the benefit of Peter Hall and his brother Wainsworth Hall.[2] PSR ¶¶ 79, 84. From time to time, Smith delivered money to Hampton University students who had been recruited as drug couriers for transport to New York City. Plea Tr. 31.

When Peter Hall was incarcerated under alias names in Newport News, Virginia for money-laundering charges, in Virginia Beach for selling cocaine, and in New York City for selling cocaine, Smith posted bond through other co-conspirators or through Peter Hall's lawyers. Plea Tr. 31; Sentencing Tr. 118–20. Smith utilized alias names in aiding and abetting the conspiracy. She utilized the name Candace McGhee, Jeanette Morris, and Kemba Maynard to post bond for Peter Hall, to obtain phony driver's licenses, to lease automobiles, and to rent a storage locker to hide incriminating evidence. Plea Tr. 31–32; PSR ¶¶ 58, 65; Sentencing Tr. 107–108. In addition, Smith manufactured a fraudulent birth certificate on behalf of a drug member so the member could drive with a false license between New York City and Virginia. PSR ¶ 48; Sentencing Tr. 104–106.

By early 1992, law enforcement authorities were zeroing in on Hall and his situation had grown desperate. Indeed, in January or February 1992, bounty hunters

---

1. At sentencing, Smith testified that she did not know at the time that a van she had driven contained a hidden compartment. Sentencing Tr. 107.

2. Apparently, Peter Hall gave the Jeep to his brother Wainsworth as a birthday present.

arrived at the home of Smith's parents in Richmond, Virginia and inquired about Hall's whereabouts. Sentencing Tr. 80. Smith was home at the time and spoke with the bounty hunters. *Id.* After the bounty hunters left, Smith called Hall and told him that bounty hunters were looking for him. Sentencing Tr. 80–81.

In the fall of 1992, Hall moved his end of the drug operation to Charlotte, North Carolina. Sentencing Tr. 82–83. Rather than matriculating at Hampton University for another semester, Smith moved to Charlotte and enrolled in Johnson C. Smith College in Charlotte that fall. Sentencing Tr. 83. In early 1993, Smith withdrew from Johnson C. Smith College and enrolled in Central Piedmont College in Charlotte, North Carolina. Sentencing Tr. 94. Around this time, Smith became pregnant with Hall's baby. Sentencing Tr. 84. Smith suffered a miscarriage and did not carry the baby to term. *Id.*

In May 1993, Hall returned to Charlotte, North Carolina from New York and learned that law enforcement authorities had searched an apartment he shared with Smith. PSR ¶ 63. Hall was edgy and nervous that a member of the network was cooperating with authorities. *Id.;* Sentencing Tr. 85. On May 24, 1993, Hall instructed Smith to contact her attorney in Richmond, Virginia to ascertain what law enforcement authorities knew about the cocaine ring. PSR ¶ 63; Sentencing Tr. 85.

Hall became increasingly convinced that a co-member of the ring, Derrick Taylor, was an informant for the federal authorities. Sentencing Tr. 92. On May 25, 1993, Hall and Taylor drove a van to Charlotte, North Carolina with another female, who was driving in a separate car. Sentencing Tr. 41. After stopping for lunch in Greensboro, the three individuals switched cars. Sentencing Tr. 41–42. The female and Hall drove in the van and Taylor followed in the other vehicle. Sentencing Tr. 41–42. While in the van, Hall told the female that he was going to kill Taylor. Sentencing Tr. 42. Eventually, the cars pulled off the road and Hall, who was armed with a gun, got out of the van and into the car driven by Taylor. *Id.* The female drove ahead to a store and waited for Hall, who arrived by himself fifteen to twenty minutes later. Sentencing Tr. 42–43. On the drive back to Charlotte, Hall instructed the female to toss his gun out of the van window. Sentencing Tr. 43. Taylor was later found dead. *Id.*

Hall phoned Smith on the way back to Charlotte. Sentencing Tr. 43. Either on the phone or shortly thereafter, Hall admitted to Smith that he had shot Taylor.[3] Smith met up with Hall and the female at a hotel in Charlotte. Sentencing Tr. 43. Smith delivered a "getaway" car, a white Acura that Hall used to drive to Atlanta. *Id.;* PSR ¶ 64. Two days later, on May 28, 1993, Hall called Smith and told her to clear the house in Charlotte of incriminating material and other items belonging to Hall. PSR ¶ 65; Sentencing Tr. 111–112. Smith leased a storage locker in the name of Kemba Maynard and stored weapons, scales, drug trafficking paraphernalia, and implements used to create false identification documents. *Id.*

Once Smith completed her spring finals, she traveled to Atlanta and delivered the storage locker key to Hall. Sentencing Tr. 112. On June 9, 1993, Smith told Hall that federal authorities were interested in interviewing her. PSR ¶ 66; Sentencing Tr. 85–86. Hall instructed Smith to meet with the agents and find out what they knew about the drug ring. *Id.* Hall further instructed Smith to tell federal agents that

---

**3.** Smith testified at her sentencing hearing that she did not know that Derrick Taylor had been killed when she met Hall in Charlotte. Sentencing Tr. 112. The Government stated that Hall had admitted to Smith that he had shot Taylor and had asked her to remove incriminating evidence from their apartment in Charlotte. Plea Tr. 32. When asked at the guilty plea hearing whether the Government's version of the facts was true and correct, Smith responded that they were. Plea Tr. 39–40.

she did not know his brother Wainsworth and that she was being supported financially by other men. *Id.*

Smith met with agents from the Drug Enforcement Administration and Internal Revenue Service in Richmond, Virginia on June 28, 1993. PSR ¶ 68; Sentencing Tr. 92, 137–140. Federal agents proffered a letter of immunity in exchange for truthful information Smith could provide about the cocaine network. *Id.* Smith was specifically asked about the murder of Derrick Taylor and her involvement and knowledge of the conspiracy. *Id.* Smith failed to provide information about the activities of the organization. *Id.* Smith also lied to federal authorities and misled them into believing that she did not know Wainsworth Hall or his role in the ring. *Id.* Additionally, she lied and told authorities that she knew nothing about Derrick Taylor's murder, and she lied and told federal agents that she was a prostitute. *Id.* Shortly after the interview, Smith reported back to Hall about her interview. *Id.*

In August 1993, Smith registered at Virginia Commonwealth University in Richmond, Virginia. Sentencing Tr. 94; PSR ¶ 124. Smith lived with her parents in Richmond and attended classes. Sentencing Tr. 93–94. During the fall term, Smith called Hall repeatedly and wired him around $200 on three or four occasions, and she visited Hall in Atlanta on two occasions. Sentencing Tr. 94–96.

### Grand Jury Indictment

On December 8, 1993, the Grand Jury for the Norfolk Division of the Eastern District of Virginia returned a sealed, multi-count Indictment against Smith and eleven other co-conspirators including Hall. The Grand Jury charged Smith and the other defendants with numerous violations of the federal narcotics and money laundering laws, operation of a continuing criminal enterprise, murder in furtherance of a continuing criminal enterprise, weapons charges, and substantive drug-related charges. The Court directed warrants to be issued on Smith and the other defendants named in the Indictment. On December 30, 1993, the Court ordered that the Indictment be unsealed.

At the time the Indictment was returned, Smith fled her parents' home and became a fugitive. PSR ¶ 70; Sentencing Tr. 95–97. She followed Peter Hall to Houston, Texas, and for the next nine months, the two eluded authorities. Sentencing Tr. 95–97. While on the lamb, Smith again became pregnant with Hall's child.[4] Sentencing Tr. 99.

In their absence, a jury trial commenced on June 14, 1994 against three co-conspirators in the drug ring.[5] One of the defendants pled guilty during the first week of the trial. On June 27, 1994, the jury returned a guilty verdict against Wainsworth Hall for the following offenses: 1) conspiracy to possess with intent to distribute and to distribute, in violation of 21 U.S.C. § 846; 2) engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; and 3) conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 371. PSR ¶ 3. Co-defendant Derrick Kelly was acquitted of all counts. PSR ¶ 7. Wainsworth Hall received a life sentence and his convictions and sentence were affirmed on appeal. *See United States v. Hall,* 93 F.3d 126 (4th Cir.1996).

In late August 1993, Smith and Hall were holed up in Seattle, Washington. Sentencing Tr. 98–99; Detention Tr. 10. Smith was almost six months pregnant and she made the decision to come back home. *Id.* Smith took a train from Seattle to Richmond and arrived at her parent's home. Sentencing Tr. 98–100. Smith lied to her parents and told them that she had

---

4. Once in Seattle, Smith used the alias Kia April Moore to receive prenatal care and to procure food stamps. Sentencing Tr. 132.

5. The Honorable Raymond A. Jackson of the United States District Court for the Eastern District of Virginia (Norfolk Division) presided over the trial.

left Richmond because an unidentified associate of Hall's had beaten her, extorted money from her, and threatened her with physical harm. Detention Tr. 10–11; Sentencing Tr. 124. Once in Richmond, Smith contacted federal agents and the United States Attorney's office through her lawyer, Robert Wagner.[6] Sentencing Tr. 101–102.

### Grand Jury's Superseding Indictment

On August 25, 1994, the Norfolk Division of the Grand Jury returned a sixteen-count Superseding Indictment against Smith and Hall and two other fugitives from the original Indictment.[7] The Grand Jury charged the fugitives with narcotics and money laundering offenses, murder in furtherance of a continuing criminal enterprise, and a firearms offense. The Grand Jury charged Smith under Counts 1, 2, 14, 15 & 16 of the Superseding Indictment. Under Count 1, Smith was charged with conspiracy to possess with intent to distribute and to distribute in excess of five (5) kilograms of cocaine, and in excess of fifty (50) grams of crack cocaine, in violation of 21 U.S.C. § 846. Under Count 2 and Count 14, Smith was charged with conspiracy to launder money and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 371 and 2. Under Count 15, Smith was charged with making false statements to federal agents, in violation of 18 U.S.C. § 1001. Finally, under Count 16, Smith was charged with forfeiture under 21 U.S.C. § 853.

### Detention Hearing

Based on the Superseding Indictment, a new warrant was issued for Smith's arrest on August 25, 1994. On September 1, 1994, Smith surrendered to federal authorities and made an initial appearance before United States Magistrate Judge Tommy E. Miller. Smith pled not guilty and requested a jury trial. On the same day, a detention hearing was held before Judge Miller, who denied bond and ordered detention. Smith's father testified on behalf of his daughter and relayed his daughter's fictitious story that an unnamed drug associate had beaten her up and extorted money from her. Detention Tr. 10–11, 21–22. Smith would later admit at sentencing that this tale of threats and extortion was a fabrication. Sentencing Tr. 124–125.

On September 30, 1994, Smith and her attorney Robert Wagner met with federal agents and Assistant United States Attorney Fernando Groene. Sentencing Tr. 124–125. On that occasion, Smith failed to disclose Peter Hall's location in Seattle, even though she knew he was living there under the alias Curtis Lamont Saunders. Sentencing Tr. 103–104, 125–126. On October 1, 1994, Hall was found murdered in his apartment in Seattle. Sentencing Tr. 125; Plea Tr. 42. Smith found out about Hall's death on October 2, 1994 or October 3, 1994. Sentencing Tr. 104; Plea Tr. 42. Smith and her attorney set up another meeting with federal authorities on October 4, 1994. See Smith's Amended Habeas Petition, at 25.

### Guilty Plea Hearing

On October 17, 1994, a guilty plea hearing was held before this Court (the Honorable Richard B. Kellam, presiding). Smith pleaded guilty to Count 1 (narcotics conspiracy), Count 2 (money laundering conspiracy), and Count 15 (false statements to federal agents) of the Superseding Indictment. As part of the plea agreement, the Government promised to dismiss the remaining counts of the Superseding Indictment and original indictment if Smith entered a plea of guilty. Plea Tr. 7. The Court conducted a thorough Rule 11 colloquy and accepted Smith's plea as being

---

**6.** At sentencing, Smith testified that during the time she was gone, she had no knowledge that an Indictment had been handed down and a warrant issued for her arrest. Smith claimed that her parents informed her about the outstanding warrant when she returned home. Sentencing Tr. 102.

**7.** The other two fugitives were Eric Marshall and Dirk Ladson.

voluntarily and knowingly made. Plea Tr. 3–28.

The Court presented the outline of the plea agreement and the counts to which Smith was pleading guilty. Plea Tr. 7–24. The Court also informed Smith about the maximum statutory penalties, fines, and supervised release terms resulting from conviction of those offenses. Plea Tr. 9–12. In addition, the Court informed Smith about the Sentencing Guidelines and how they generally operate in calculating a sentence. Plea Tr. 10. The Court informed Smith about her right to a jury trial, her right to plead not guilty, her right to be confronted by her accusers, her right against self-incrimination, her right to raise defenses, the presumption of innocence at any trial, and the burden of proof on the government to prove her guilt beyond a reasonable doubt. Plea Tr. 12–19. Smith indicated that she understood those rights. *Id.* Smith stated that she had discussed the charges and had read the indictment with her counsel and was so satisfied with his advice and assistance. Plea Tr. 6–8. The Court asked Smith a second time whether she was satisfied with the advice and assistance of counsel:

Court: Have you had any trouble in communicating with your counsel? That is having your lawyer understand what you had to say about the case, and you understanding what he has had to say about the case?

Smith: No, I haven't had any trouble.

Court: Again, are you satisfied with the advice and assistance which he has given you up to this time?

Court: Yes, I am.

Plea Tr. 20–21.

The Court reminded Smith that in the plea agreement, she was waiving her right to appeal her sentence:

Court: In the plea bargain and agreement, you have agreed that you will give up any right of appeal that you would have as to any sentence imposed upon you in this case, if the sentence is within the provisions of the statute or law.... The only time you would have a right to appeal is if the sentence that is imposed is not in accordance with the statute, within the limits provided by statute. Do you understand that?

Smith: Yes, I do.

Plea Tr. 19–20.

The Court asked Smith whether the Government had promised to move for the Court to depart from the guidelines or otherwise promise a reduction in her sentence based on her cooperation. Plea Tr. 24. Smith responded that "[i]t has been indicated that it may happen. No promises have been made." Plea Tr. 24. The Court then advised Smith of her rights under the plea agreement and the consequences of a plea:

Court: Now, they reserve the right, of course, to move for—- ask the court to give you a lesser sentence than provided by the guidelines. They reserve that right. And when the matter is presented to the court, they have agreed that they will bring your cooperation to the attention of the court.

But I want you to understand this. They have a perfect right to move for a lesser sentence. They are not compelled to do so, and there is nothing in the plea bargain agreement which requires them to do so. So while you may have in you mind that they are going to do so or you want them to do so, I want you to understand there is nothing in the plea bargain agreement which requires them to do so. They reserve the right to do it.... The court can't compel them to do it. Do you understand that?

Smith: Yes, I do.

Court: I just want you to understand, they make the recommendation. The court is not compelled to follow it. So that they may make a recommendation to give you, instead of the minimum sentence under the guidelines, to give you half of the minimum sentence or any portion of it. The court is not compelled to follow that .... That is a matter that the judge has the discretion on whether he will or will not follow it, and I make no suggestion to you that the court would not follow it or that it would follow it....

Your counsel is going to ask the court in all probability to give you some reduction in sentence or to make it as light as the guidelines will permit. But that doesn't mean that the court has to do so. Do you understand that?

Smith: Yes, Your Honor.

Plea Tr. 24–26.

In order to make sure Smith understood her rights, the Court continued:

Court: I'm always concerned about it if a defendant comes into court and enters a plea of guilty, having a feeling that the United States attorney is going to move for some reduction of the sentence. And if you are entering a plea of guilty in the case because of your hope of that, you have a right to hope for it, but I want you to understand that is not a legal— it is not legal and binding in any way on the United States attor-

ney or upon this court, and if they have agreed to you privately they are going to do it, you'd better tell me about it now, because it won't make any difference when the time comes for sentencing.

If there has been any agreement that they are going to move for a reduction of sentence, this is the time to tell me about it, because I'm not going to accept your plea if that's a part of the plea bargain.

Smith: No, No promises have been made to me.

Court: No promise has been made.

Smith: No.

Plea Tr. 26.

The Court accepted the plea and then denied Smith's motion to release her in home detention pending sentencing. Plea Tr. 28, 43–45. The matter was continued for sentencing pending the preparation of a presentence report.

### Presentence Report

A presentence report was prepared and distributed to the parties. On December 16, 1994, defense counsel Robert Wagner advised the probation officer of certain objections. Wagner also filed written objections on December 29, 1994, which incorporated his earlier objections and raised other objections. William Robinson, who was newly-retained defense counsel since the guilty plea hearing, also noted objections to the report and filed his own written objections on December 30, 1994. Taken together, defense counsel's objections were extensive.[8] Among the major

---

8. Besides the objections outlined above, defense counsel objected to the reference that Smith was a member of a conspiracy or participated in any act that would further the conspiracy. *See* PSR ¶ 14. In this regard, defense counsel claimed that Smith's knowledge, actions, and intentions were dictated by Peter Hall. Defense counsel objected to the reference that Smith was knowledgeable of Peter Hall's cocaine network prior to September 1991. *See* PSR ¶ 25. Defense counsel objected to the fact that Smith had typed a false birth certificate as a means to further the conspiracy. *See* PSR ¶ 48. Defense counsel objected to the suggestion that Smith was aware that money and drugs were concealed in a hidden compartment in a vehicle she and another individual drove from New York to Charlotte, North Carolina in the summer of 1992. *See* PSR ¶ 49. Defense counsel object-

objections raised, defense counsel argued that Smith should be attributed with 5 kilograms of crack cocaine based on her alleged dates of involvement in the drug conspiracy, rather than 255 kilograms of crack cocaine as provided in the presentence report. *See* PSR ¶ 94. Second, defense counsel argued that Smith should be attributed with only $3,000 in laundered money based on her involvement in the conspiracy, rather than more than $1,000,000 as contained the presentence report. *See* PSR ¶ 94. Third, defense counsel asserted that Smith should be awarded at least a two level reduction for her minor role in the ring, as provided under U.S.S.G. § 3B1.2(b). Fourth, defense counsel maintained that Smith should not be given an enhancement for obstruction of justice under U.S.S.G. § 3C1.1, or an enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1). Fifth, defense counsel claimed that Smith should be given a sentence reduction based on duress or coercion under U.S.S.G. § 5K2.12.

### *January 30, 1995 Hearing*

The sentencing hearing was originally scheduled for January 30, 1995. Hearing Transcript ("Tr.") 1. On the same day, Smith filed a motion to withdraw her guilty plea. *Id.* at 2–3. In addition, the Government petitioned to remove Smith's lawyer William Robinson as counsel based on a potential conflict of interest. *Id.* at 3. The Government indicated that Robinson had been representing William Foreman,

an unindicted co-conspirator who had pled guilty in return for his cooperation. *Id.* at 3–4, 19. The Government also stated that Robinson had tried to represent co-conspirator Wainsworth Marcellus Hall at his arraignment hearing. *Id.* at 4. On that prior occasion, the Government had made a similar motion to have Robinson withdrawn.[9] *Id.* Robinson subsequently withdrew from Wainsworth Hall's case. *Id.* at 11–13.

In this matter, the Government stated that William Foreman had been a witness before the Grand Jury and could be a government witness at Smith's trial. *Id.* at 25. The Government stated that if Mr. Robinson had learned anything from his prior representation, it could affect Smith's substantive rights. *Id.* at 12–13. The Court had Smith sworn and the Government questioned Smith and made sure she understood Robinson's potential conflict of interest. *Id.* at 15–19. The Government's questioning ended this way:

> Gov't: And do you understand that in the course of that representation, Mr. Robinson might find out something which directly implicates you in this case?

> Smith: Yes, I understand.

> Gov't: You understand that the Sixth Amendment to the Constitution of the United States provides that you have a right to effective assistance of counsel and that

ed to the suggestion that Smith obtained a false driver's license in order to conceal her true identity or to further the ends of the conspiracy. *See* PSR ¶ 58. Defense counsel objected to the notion that Smith contacted her attorney in Richmond, Virginia in an effort to find out what information law enforcement agents had gathered against Peter Hall and the ring. *See* PSR ¶ 63. Defense counsel objected to the notion that Smith was aiding Peter Hall's effort to evade law enforcement after the murder of Derrick Taylor when Smith delivered an Acura automobile to Hall. *See* PSR ¶ 64. Defense counsel objected to the suggestion that Smith met with law enforcement agents in June 1993 solely to gather information on behalf of Peter Hall. *See*

PSR ¶ 66. Defense counsel objected to the suggestion that Smith had fled her parents' home after learning that the original indictment had been returned by the Grand Jury. *See* PSR ¶ 70. Finally, defense counsel objected to the suggestion that Smith acquired vehicles utilized in the conspiracy. *See* PSR ¶¶ 74 & 84.

9. In that prior motion, the Government had argued that Robinson had a conflict of interest in representing Wainsworth Hall and William Foreman, since Foreman had provided information to the Grand Jury and was a potential witness at trial. *Id.* at 4, 19–20, 25.

that effective assistance means that your counsel, your lawyer, must not— shall not have any conflict of interest?

Smith: I understand that, yes.

Gov't: And that you can waive that conflict after you are knowingly, voluntarily, and intelligently advised of the possibility of a conflict of interest?

Smith: I understand.

Gov't: Do you want to continue these proceedings with Mr. Robinson as a lawyer, even if he might have information regarding your criminal activity in this case?

Smith: Yes, I would like to continue.

Hearing Tr. 18.

The Court decided that on the motion to withdraw the guilty plea, Smith was entitled to separate counsel. *Id.* at 39. The Court determined that present counsel was a potential witness on the matter. *Id.*

### April 20, 1995 Sentencing Hearing

The matter was continued until April 20, 1995, at which time Smith indicated that she wanted to withdraw her earlier motion to withdraw the guilty plea. Sentencing Tr. 4. The Court conducted a thorough examination of Smith and inquired whether she conferred with counsel on the matter and was satisfied with counsel's advice and assistance. Sentencing Tr. 4–25. As part of that examination, the Court inquired whether Smith had been threatened or coerced into withdrawing her motion to withdraw her plea. *Id.* The Court also reminded Smith that at the original sentencing hearing, she had waived her right to a conflict of interest involving her attorney Robinson:

Court: At that time I believe you said you had no objection at all to his [Robinson's] appearing, that you waived any right that you might have as to any conflict that might result. Do you remember that?

Smith: Yes.

Court: Now, ... do you have any objection today to his participating in the sentencing?

Smith: No, I do not, Your Honor.

Court: Do you want him to participate in the sentencing?

Smith: Yes, I do.

Court: Even though it should appear at some subsequent time that someone suggests there was a conflict of interest on his part, you want to waive any right to raise that as an objection to anything that occurs during the time of sentencing?

Smith: Yes, I do.

Sentencing Tr. 27–28.

Smith also was asked about her earlier comment at the Rule 11 colloquy about an alleged promise of a reduced sentence. *Id.* at 6. The exchange went as follows:

Smith: Indirectly I was told that I would get some type of assistance, but later I am finding out that I wouldn't.

Court: Who told you that?

Smith: My attorney, Robert Wagner.

Court: Did the United States Attorney ever make—anyone from the United States Attorney's office or anyone connected with the prosecution of this case ever suggest to you or indicate to you or make any promise to you that they would ask the court to give you a reduced sentence other than what was called for by the guidelines?

Smith: No. Not directly to me, no.

Court: Well, do you know whether any such comment to your attorney or anyone connected with your defense in the matter?

Smith: Yes, that comment was made.

Court: All right. And how do you know that?

Smith: Because my attorney told me so.

Court: But you did not hear it?

Smith: No, I didn't.

Sentencing Tr. 6.

The Court refreshed Smith's recollection by reading from the plea hearing transcript. *Id.* at 7–8. In particular, the Court read where Smith had stated that no promises had been made to her. *Id.* at 8.

Court: Is that correct that you answered that no promises had been made?

Smith: Yes, that's correct.

Court: Well, you were telling the truth then, weren't you?

Smith: Yes, I was telling the truth. There were no promises, but there was just an understanding, that's all.

Court: Well, tell me what the understanding was?

Smith: Just that I would receive some type of reduction, a possibility of reduction after I pled guilty.

Court: Possibility of reduction, is that what was said to you?

Smith: No, that I would receive a reduction after I pled guilty.

Court: Well, if that was the promise that was made to you, since the time you have entered the plea have you had any discussions with anyone in the United States Attorney's office, anyone at all dealing with the prosecution of this case wherein they made any statements to you concerning your sentence?

Smith: No, I have not.

Court: Have there been any discussions so far as you know between your counsel and the United States Attorney's office concerning the making of any motion for a reduction of your sentence?

Smith: Yes, there has been.

Court: All right. And what is that?

\* \* \* \* \* \*

Smith: Just that the prosecutor said that he wouldn't have any objections to going outside of the sentencing guidelines.

\* \* \* \* \* \*

Smith: My responsibilities are to assist the government, and after my assistance that they would be willing to offer me a sentence reduction.

Court: Now, is that the reason that you have withdrawn your motion to withdraw the plea?

Smith: No, that's not the complete reason, no. Because of counsel also.

Court: Was that a part of the reason?

Smith: Yes.

Court: Now, as I understand what you are saying, the United States Attorney's office agreed they would make a motion to the court saying they had no objections to the court going outside of the guidelines. Is that what you said?

Smith: Yes.

Court: And is that the total of any promise or understanding which you have had with them?

Smith: Yes.

Court: No other condition o[r] provision?

Smith: No.

Sentencing Tr. 9–10.

The Court read from the guilty plea transcript concerning Smith's rights under the plea agreement and the consequences of her plea. *Id.* at 10. The Court continued:

Court: You [ ] understand that while the United States Attorney may make the motion for a reduction of sentence or it may say it has no objection to reduction of the

court going outside of the guidelines, I want you to understand that after time of sentencing the mere fact that they have no objection to the court going outside of the guidelines has no meaning whatsoever because the court could not bring you back for any change of sentencing except upon a motion made by the United States Attorney for cooperation which has occurred since that time. And it's not merely a statement that he has no objection to it; he must make the motion. Otherwise, the court has no authority whatsoever to do it.... Do you understand that?

Smith: Yes, I do.

Court: Now, understanding all of that, are you sure that you want to withdraw your motion to withdraw the plea of guilty which you previously entered?

Smith: Yes.

Court: Other than your statement as to what your counsel has told you that the [government] at a Rule 35 motion will make no objection to the court going outside of the guidelines, other than that statement has there been any offer or any inducement of any kind made to you in order to have you agree to withdraw your plea of guilty ...?

Smith: No, sir.

\* \* \* \* \* \*

Court: That's the sole offer that's been made to you?

Smith: Yes.

Court: Well, I want you to understand this: It is absolutely an illegal motion. It has no meaning whatsoever. The court could not act upon it even if it wanted to do so. So if that is any inducement to you to withdraw your motion to withdraw the plea, I want you to understand now that you are wasting your time because it has no meaning whatsoever. The court could not grant it even if it wanted to.

Sentencing Tr. 11–14.

Smith's lawyer Robinson represented to the Court that the motion to withdraw the motion to withdraw the plea was not based on this understanding with the Government. *Id.* at 14–21. Rather, the motion to withdraw was based solely on an understanding that Smith would cooperate with authorities in the hope that they would consider a substantial assistance motion. *Id.* The Court proceeded to question Robinson and then Smith and Wagner:

Court: Well, to be certain that I understand exactly what you say the agreement is, there is no agreement on the part of the United States Attorney at the time of sentencing to make any motion or to unoppose any motion that be made for a reduction of sentence?

Robinson: Correct.

Court: Your understanding or hope is that because of cooperation which you expect the defendant will give to the United States Attorney's office and/or to the prosecution in this case, that will lead them to file a Rule 35 motion, but there is no agreement by the United States Attorney's office that regardless of what cooperation she may give, that they will file a Rule 35 motion.

Robinson That is correct.

Court: Am I correct?

Robinson: That is correct.

\* \* \* \* \* \*

894

Court: Okay. Now, Ms. Smith, do you thoroughly understand what we have been discussing?

Smith: Yes, I do.

Court: Do you understand there is no agreement by the United States Attorney's office, no representation by the United States Attorney's office, no representation by the United States Attorney's office or indication by the United States Attorney's office that regardless of what cooperation you may give from this day forward that they will make a Rule 35 motion for a reduction of your sentence? Do you understand that?

Smith: Yes, I do.

Court: It is only a hope on your part?

Smith: Right. Yes, your honor.

* * * * * *

Court: You want the court to permit you to withdraw, then, the motion to withdraw your guilty plea?

Smith: Yes.

Court: Is that what you want?

Smith: Yes, I do, Your Honor.

Court: You feel you thoroughly understand what you are doing today?

Smith: Yes, I do.

Court: You realize that you are surrendering a right which you may have or the right that you have under the law and the constitution? You are giving up that right in asking the court to permit you to withdraw the plea of guilty. Do you understand that?

Smith: Yes, I do, Your Honor.

Court: And the only promise or indication of any assistance that you would get is your hope

that what information you furnish to the prosecution or to the United States Attorney's office or its official will lead them to file the Rule 35 motion. Is that your understanding?

Smith: Yes, Your Honor.

Court: Mr. Robinson, Mr. Wagner, is that your understanding of it, too?

Robinson: It is, Your Honor.

Wagner: Yes, Your Honor.

Sentencing Tr. 20–23.

At this point, the Court allowed the Government to make any objection to the withdrawal of Smith's motion. *Id.* at 23. The Government had no objection and made the following statement:

Gov't: I just want the record to be clear in reflecting that contrary to what Ms. Smith inferred or let the court infer, there is no quid pro quo as to why she is withdrawing her plea. The government has not promised her anything now, will not promise her anything later, and did not promise her anything [not contained in] the plea agreement where it states that the parties agree that the United States reserves its options to seek any departure from the applicable sentencing guidelines pursuant to Section 5K or Rule 35(b) of the Federal Rules of Criminal Procedure . . . .

[I]f the government files the motion, it's because the government is satisfied that Miss Smith has complied with the terms of the plea agreement in the paragraphs I cited. So I just want the court to be clear there's no quid pro quo in the motion to withdraw the motion to set aside the plea agreement.

Sentencing Tr. 24.

Accordingly, the Court permitted Smith to withdraw her motion to withdraw her guilty plea. Sentencing Tr. 24.

At sentencing, Smith's lawyers introduced mitigating evidence that Smith had suffered from "battered woman's syndrome". In support of this defense, Smith's lawyers called numerous experts and lay witnesses, and introduced medical records and other documentary evidence. Among those who testified, Smith's lawyers called Caira Clever Cephas and Candace R. Jeter to the witness stand. Both Ms. Cephas and Ms. Jeter had attended Hampton University with Smith and were members of the cocaine ring.[10] Sentencing Tr. 28–65. Both agreed that Hall was a charismatic man who women found attractive and exciting to be around. Sentencing Tr. 56–57, 59; *see also* Detention Tr. 71. Both also testified, as did Smith, that Hall had a violent streak and was known to be physically and emotionally abusive. All the witnesses concurred that Smith's relationship with Hall was marked by episodes of brutal rage. According to the witnesses' testimony, Hall slapped, beat, or choked Smith on many instances, and he would often yell and scream at her.

For instance, in the summer of 1991 at a party in Philadelphia, Hall spied Smith talking to another man on the street. Sentencing Tr. 69–71. Hall became upset and, later that night in their hotel room, Hall grabbed Smith by the throat. Sentencing Tr. 71. When Smith tried to defend herself, Hall punched Smith in the face. *Id.* Smith's face was swollen from the beating and she was treated at a local hospital. *Id.* at 72–73. Smith lied to doctors and told them that she had hit her head on the windshield during a car accident.[11] *Id.;* Sentencing Exhibit 1.

On another occasion, Smith met Hall in Newport News in January or February of 1992 after she had been questioned by authorities at her parent's home. Sentencing Tr. 80. Hall interrogated Smith about the incident and, becoming nervous, Smith stammered with the details. *Id.* In a mad fury, Hall began to kick and beat Smith with a belt. Sentencing Tr. 81. Hall's beating caused swelling to Smith's face and body, and Hall told Smith to soak in the bathtub. *Id.* While in the tub, Hall continued to question her and hit and beat her with a brush. *Id.* Ms. Cephas was in a nearby room and could hear Hall yelling. Sentencing Tr. 30–31, 80. When Hall left the bedroom where the beating took place, Ms. Cephas went to check on Smith and found her bruised and beaten. *Id.*

Ms. Cephas also was a girlfriend of Hall. She and Smith both testified that Hall forbid them to use birth control. Sentencing Tr. 48, 81–82. As a result, both Smith and Ms. Cephas got pregnant and had children by Hall. Sentencing Tr. 36, 37.

---

10. Ms. Cephas testified as a government witness at the trial of Wainsworth Hall and is currently in the Witness Protection Program. Sentencing Tr. 29, 36.

11. To highlight other portions of the testimony, in the summer of 1991 at an apartment, Smith got up to get the door for co-conspirator Derrick Taylor. Sentencing Tr. 73. After Taylor left, Hall yelled at Smith and smacked her and told her "not to jump for anybody else." Sentencing Tr. 73.

On another occasion in the summer of 1992, Peter Hall became upset when he did not like the way a male co-conspirator said good-bye to Smith when leaving Ms. Jeter's apartment. Sentencing Tr. 54–55, 74. Smith voiced her opinion that Hall should speak to the other individual about the matter. *Id.* Hall smacked Smith and pushed her into the door of the apartment. Sentencing Tr. 54–55, 75. Hall then told Ms. Jeter to leave her apartment. Sentencing Tr. 55. Once she left, Hall threw Smith across the apartment and slapped and beat her, and grabbed her by the neck. Sentencing Tr. 75.

On another occasion, Hall became upset when, at a pool party, a man flirted with Smith and tried to take her bikini top off. Sentencing Tr. 78. Hall claimed that Smith had provoked the flirtation and he began to yell and beat Smith. Sentencing Tr. 79.

In the spring of 1993, Hall and Smith went to Wainsworth Hall's house in Charlotte, North Carolina. Sentencing Tr. 84. Hall became upset when Smith had a conversation with a woman Hall believed to be a lesbian. *Id.* Smith was pregnant at the time, and Hall hit Smith in the back of the head and in the face. *Id.*

Smith's lawyers also called expert witnesses to testify about battered woman's syndrome. Lawyers called Dr. Jo Ann Marie Wilson, who was Smith's treating psychologist. Sentencing Tr. 156–57. In 1990, Smith went to see Dr. Wilson for counseling at a time when she had not yet met Hall. Sentencing Tr. 157, 184. Around the time of her arrest, Smith called Dr. Wilson and resumed her therapy. Sentencing Tr. 158. At the sentencing hearing, Dr. Wilson testified that Smith had suffered from depression, battered woman's syndrome, and post-traumatic stress syndrome around the time of her arrest. Sentencing Tr. 159. Dr. Wilson also testified that Smith was suicidal initially and suffered from poor confidence and low self-esteem, although Smith had become a much "healthier" person after resuming her therapy. Sentencing Tr. 159–60, 171–172.

Dr. Wilson commented on battered woman's syndrome in the context of Smith's relationship with Hall. Dr. Wilson testified that the batterer seeks to control all aspects of a person's life. Sentencing Tr. 166. Dr. Wilson believed there was substantial evidence that Hall sought to control all facets of Smith's life. Id. Dr. Wilson noted that Hall forbid Smith to use birth control. Id. Dr. Wilson noted that Smith had been raised in a home with a dominant father figure and a caretaker mother. Sentencing Tr. 184. Dr. Wilson testified that women raised in such homes sometimes will bond with dominant and abusive men. Id. Dr. Wilson also stated that in an abusive relationship, as she believed Smith's relationship with Hall had been, the batterer's influence is total and complete. Sentencing Tr. 189–197.

Defense counsel also called Dr. Alice L. Twining to testify about battered woman's syndrome theory. Dr. Twining is a licensed psychologist who offered her expert opinion based on a conversation with Dr. Wilson and on the testimony presented at the hearing. Sentencing Tr. 142–43, 153–154. In her testimony, Dr. Twining maintained that a battered woman forms an intense attachment, or "traumatic bonding", when subject to alternating episodes of abuse and kindness. Sentencing Tr. 143–44. According to Dr. Twining, the batterer becomes both abuser and rescuer. Sentencing Tr. 146. Dr. Twining thought that Smith's relationship with Hall fit this pattern of a battered woman. Id. As support for this diagnosis, Dr. Twining claimed that younger women are more susceptible to this pattern of behavior, and the coercion exerted knows no geographical or temporal bounds. Sentencing Tr. 145–49. Dr. Twining concluded that in her expert opinion, Smith was not acting under her own free will. Sentencing Tr. 149–51.

At the close of all the evidence, the Court sentenced Smith to 294 months imprisonment on Count 1 for drug conspiracy. This feil into the middle of the guideline range of 262—327 months. The Court also sentenced Smith to sixty (60) months on Count 2 for money laundering, and sixty (60) months for making or concealing materially false statements or facts on Count 15, all of which sentences were to run concurrently. Upon the Government's motion and pursuant to the plea agreement, the Court dismissed Counts 14 and 16 of the Superseding and original indictment. The Court also informed Smith about her right to appeal her sentence notwithstanding the fact that she had waived that right in the plea agreement. Sentencing Tr. 263.

Before imposing sentence, the Court spoke at length about the complicated nature of Smith's case. Ultimately, however, the Court rejected a downward departure on the grounds that Smith had been under duress or had been coerced. The Court could not accept such a defense when Smith had dated Hall for such a long time and had witnessed Hall's violent nature. In the Court's view, Smith understood and appreciated the criminality of Hall's actions. The Court did not believe that Smith committed the offenses solely out of fear. In this sense, the Court rejected the

notion that Hall's will over Smith had no geographical or temporal bounds. Sentencing Tr. 251–257.

The Court also concluded that Smith had understood and appreciated the wrongfulness of her own actions. The Court noted that Smith was a college-educated woman who had a sense of right and wrong. In fact, the Court pointed out that Smith grew up in a strong, middle class family with parents who by all indications loved and cared for her. Sentencing Tr. 251–257.

### *Appeal and Habeas Petition*

On April 27, 1995, by counsel William Robinson, Smith filed a notice of appeal to the judgment of the Court. The Government filed a motion to dismiss the appeal on the grounds that Smith knowingly and voluntarily waived her right to appeal her sentence. Smith filed a response to the Government's motion. In the response, Smith argued that her offense conduct was the product of coercion and duress and the trial-court should have departed downward from the Sentencing Guidelines. On July 19, 1995, the Fourth Circuit Court of Appeals dismissed Smith's appeal on the motion of the Government. *See United States v. Smith,* CA No. 95–5344. Smith filed a petition for writ of certiorari to the United States Supreme Court which was denied.

On April 23, 1997, Smith filed a motion for habeas relief under 28 U.S.C. § 2255. On June 5, 1997, this Court dismissed the habeas petition as untimely. Smith applied for a certificate of appealability with this Court, and her application was granted on July 11, 1997. Thereafter, Smith filed a notice of appeal to the denial of her habeas petition on July 24, 1997.

On September 15, 1998, the Fourth Circuit Court of Appeals held that the habeas petition was not time-barred. The Court of Appeals therefore vacated this Court's order and remanded the matter for further proceedings. On December 4, 1998, this Court directed the United States to file an answer or other pleadings to Smith's habeas motion. On January 13, 1999, Smith filed an amended habeas motion. On February 2, 1999, the Government filed a response to Smith's habeas motion. On February 24, 1999, Smith filed a traverse to the Government's response. This matter is ripe for decision.

### II. Analysis

Smith alleges numerous violations of her constitutional rights. Smith believes that her allegations raise questions of material fact that require an evidentiary hearing and support her request for certain discovery.

■ Section 2255 provides for an evidentiary hearing unless the evidence conclusively shows that the petitioner is not entitled to relief. 28 U.S.C. § 2255; *United States v. Magini,* 973 F.2d 261, 264 (4th Cir.1992). Evidentiary hearings are not mandated in every § 2255 proceeding. *See* Rule 8(a) of the District Court Rules Governing Section 2255 Cases. In fact, where the record, transcripts, files and affidavits are sufficiently adequate, the district court may resolve these disputes without the need for a hearing. *See Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973).

■ A habeas petitioner is not entitled to discovery in the ordinary course of proceedings. *See Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 1796–1797, 138 L.Ed.2d 97 (1997). Rule 6 of the Rules Governing § 2255 Proceedings provides that a habeas petitioner must demonstrate good cause in order to obtain discovery. Under the rule, the petitioner must make a preliminary showing that requested documents contain exculpatory or impeaching information in order to compel production. *United States v. Roach,* 28 F.3d 729, 734 (8th Cir.1994).

### 1. *Knowing and Voluntary Plea*

■ Smith argues that her guilty plea was not knowing and voluntary. A plea of guilty is constitutionally valid if it is made

on a "voluntary" and "intelligent" basis. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). Thus, the defendant must receive "real notice of the true nature of the charge against him". *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859 (1941). The "manner of ensuring that the defendant is properly informed is committed to the good judgment of the district court, to its calculation of the relative difficulty of comprehension of the charges and of the defendant's sophistication and intelligence." *United States v. Reckmeyer*, 786 F.2d 1216, 1221 (4th Cir.1986).

In this case, the plea agreement waived Smith's right to appeal and did not provide for waiver of collateral remedies under § 2255. The Government could have included a waiver of collateral rights in the plea agreement and chose not to do so. In such event, Smith did not expressly waive her rights to habeas review under the plea agreement. *See United States v. Tayman*, 885 F.Supp. 832, 834 (E.D.Va. 1995).

All the same, the plea agreement does not bar application of the procedural default rule. Because Smith failed to raise this issue on direct appeal, she is forbidden to recast the issue in her habeas petition unless she can show "cause" and "actual prejudice" or a fundamental miscarriage of justice. *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982); *Davis v. United States*, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974); *see also Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 1610, 140 L.Ed.2d 828 (1998) (petitioner's failure to challenge the validity of his plea is subject to procedural default); *United States v. Maybeck*, 23 F.3d 888, 890, n. 1 (4th Cir.1994). Of course, Smith's plea agreement waived her right to appeal and her notice of appeal was dismissed by the court of appeals on those grounds. Other courts have found that this is not sufficient "cause" for a petitioner's procedural default. *See United States v. Pipi-*

*tone*, 67 F.3d 34, 37–38 (2d Cir.1995) (plea agreement as bar to appealing sentence not "cause" justifying collateral review); *United States v. Jones*, 56 F.3d 62, No. 94–6209, 1995 WL 321263, at *1 (4th Cir. May 30, 1995) (per curiam) (unpublished opinion).

In any event, there has been no constitutional dereliction by virtue of the fact that Smith's plea was voluntarily and knowingly made. The Court presented the outline of the plea agreement and the counts to which she was pleading guilty. Plea Tr. 7–24. The Court also informed Smith about the maximum statutory penalties, fines, and supervised release terms resulting from conviction of those offenses. Plea Tr. 9–12. The Court told Smith about the Sentencing Guidelines and how they generally operate in calculating a sentence. Plea Tr. 10. The Court informed Smith about her right to a jury trial, her right to plead not guilty, her right to be confronted by her accusers, the right against self-incrimination, the presumption of innocence at any trial, and the burden of proof on the government to prove her guilt beyond a reasonable doubt. Plea Tr. 12–19.

Smith indicated that she understood those rights. *Id.* Smith stated that she had discussed the charges and had read the indictment with her counsel and was so satisfied with his advice and assistance. Plea Tr. 6–8. The Court also reminded Smith that she had waived her right to appeal in the plea agreement and Smith so acknowledged. Plea Tr. 19–20. The Government then recited the facts that it would prove were the case to go to trial. Plea Tr. 28–35. Thereafter, the Court asked Smith whether the facts were true and she admitted that they were. Plea Tr. 39–40.

The Court's inquiry was sufficient and Smith was properly informed as to the charges and the consequences of her guilty

plea.[12] The procedural dialogue establishes that Smith understood the consequences of accepting a plea. Smith's answers do not amount to "empty gestures" that may be disregarded at a future date. *See Little v. Allsbrook*, 731 F.2d 238, 240, n. 2 (4th Cir.1984). In the context of this matter, Smith must be bound by her statements at the plea hearing.

### a. *Competency*

Nonetheless, Smith argues that she was legally incompetent at the time of the Rule 11 hearing to make a voluntary and intelligent plea of guilty. Such a claim, if true, may be sufficient to overcome the significant hurdle of procedural default. In fact, due process requires that a defendant be legally competent before entering a plea of guilty. *Shaw v. Martin*, 733 F.2d 304, 314 (4th Cir.1984). The guilty plea is rendered invalid if the defendant's mental faculties were so impaired that the defendant could not appreciate the charges and consequences of her plea, and could not comprehend her constitutional rights. *Id.*

Smith believes that an evidentiary hearing and discovery are required because she was under psychological treatment at the time of her guilty plea. The Fourth Circuit has held that a habeas petitioner is not entitled to an evidentiary hearing on mental competency claims unless the evidence casts a "real, substantial, and legitimate doubt with respect to the petitioner's mental capacity and ability to assist his counsel ...." *Lawson v. Dixon*, 3 F.3d 743, 753–754 (4th Cir.1993). "Such evidence must be both positive and unequivocal." *Id.* at 754.

In this matter, Smith has not cleared this "lofty hurdle" by simply pointing out that she had been seeing a psychologist at the time of the plea hearing. *Lawson*, 3

F.3d at 754. Such evidence does not rise to the level of legal incompetency. The uncontroverted facts are that Smith was alert and in full control of her faculties at the guilty plea hearing. Smith understood the nature of the proceedings and appreciated the charges and consequences of her plea. Plea Tr. 6–40. Although markedly depressed at the time she was arrested, Smith's emotional health had steadily improved from that time forward. In fact, Smith's treating psychologist testified at sentencing that Smith had become a much "healthier person" in the intervening time since she was arrested. Sentencing Tr. 171–172. Smith's arguments add nothing to the factual mix and her claims may be resolved without the need for an evidentiary hearing or discovery.

### b. *Battered Woman's Syndrome*

Smith alleges that at the time she pled guilty, she was not informed of the availability of a complete defense.[13] According to Smith, she was a battered woman and lacked the specific intent necessary to support her conspiracy convictions. Relatedly, Smith contends that she had been acting under duress or had been coerced by Hall into committing the offenses.

Smith failed to raise this issue on appeal and is subject to the procedural default rule on collateral review. *Frady*, 456 U.S. at 165, 102 S.Ct. at 1593; *Davis*, 417 U.S. at 342, 94 S.Ct. at 2303; *see also Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir.1976); *Moore v. United States*, 934 F.Supp. 724 (E.D.Va.1996). Smith waived her right to pursue any defenses in pleading guilty. Plea Tr. 17–19. Her waiver of appeal in the plea agreement may not be sufficient "cause" to overcome the procedural default rule. *Pipitone*, 67 F.3d at 38–39; *Jones*, 56 F.3d 62, 1995 WL 321263, at *1.

---

12. When, in this situation, the plea was knowingly and voluntarily made, there is a strong presumption that the plea is final and binding. *United States v. Lambey*, 974 F.2d 1389, 1394 (4th Cir.1992) (en banc).

13. Smith's allegation of ineffective assistance of counsel is discussed in section 5(a)(3).

 In any event, Smith's claim that she lacked the statutory intent necessary for conviction has no bearing on the determination that Smith entered a voluntary and knowing plea. *See United States v. Wilson*, 81 F.3d 1300, 1308–1309 (4th Cir. 1996). Smith chose to avoid the risk of presenting her case to a jury, who could have reasonably found that she possessed the requisite "mens rea." *See id.* Rather than face that risk, Smith entered a guilty plea and benefitted from the government's written promise to move to dismiss the remaining counts of the Superseding Indictment and original indictment.

### 2. *Plea Agreement Breach*

Smith claims that the Government breached the terms of their plea agreement. Smith failed to raise this issue on appeal and her collateral attack is controlled by the procedural default rule. *Frady*, 456 U.S. at 165, 102 S.Ct. at 1593; *Davis*, 417 U.S. at 342, 94 S.Ct. at 2303; *see also Boeckenhaupt*, 537 F.2d at 1182; *Moore*, 934 F.Supp. at 724. Smith's waiver of appeal in the plea agreement may not be sufficient cause to overcome the formidable barrier of procedural default. *Pipitone*, 67 F.3d at 38–39; *Jones*, 56 F.3d 62, 1995 WL 321263, at *1.

 Nevertheless, Smith asserts that the Government made unfair promises that induced her to sign the plea agreement and to withdraw her motion to withdraw her guilty plea. The integrity of the plea bargaining process requires that the plea agreement be given great weight. *United States v. Garcia*, 956 F.2d 41, 44–45 (4th Cir.1992). Yet the outside possibility of a constitutional deficiency means that the courts do not review plea agreements under strict contract interpretation. *United States v. Carter*, 454 F.2d 426 (4th Cir.1972). A guilty plea may be rendered involuntary if the evidence shows "misunderstanding, duress, or misrepresentation by others" demonstrating a constitutional deficiency. *Blackledge v. Allison*, 431 U.S.

63, 76, 97 S.Ct. 1621, 1630, 52 L.Ed.2d 136 (1977).

#### a. *Release Pending Sentencing*

First, Smith maintains that the Government breached its promise not to oppose releasing her on bond after she pled guilty. Smith was pregnant at the time of the guilty plea hearing and wanted to remain at home until her sentencing. In Smith's view, the Government misled the Court when it stated that the Court had little discretion under the statute to release Smith on bond. In relevant part, 18 U.S.C. § 3143 provides:

> (2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless -
>
> > (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
> >
> > (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
> >
> > (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

In this case, Smith pleaded guilty to a drug trafficking charge which is described in 18 U.S.C. § 3142(f)(1)(C); an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, 21 U.S.C. § 801 et seq. Clearly the Government did not recommend that no sentence of imprisonment be imposed, and the Court could not do so under the Sentencing Guidelines.

At the plea hearing, attorney Wagner told the Court that the Government did not object to Smith's release pending sentencing. Plea Tr. 38. Wagner also under-

stood that the Court had little discretion under the statute:

> Your Honor, I know that there are certain rules governing the court under 18 USC Section 1343, that when someone is to plead guilty to such an offense as this, there may be very little discretion a judge has. But, Your Honor, what I'm asking the court to do is to release Ms. Smith on home detention, and in effect she remains in detention, pending her—the period of time between now and her sentencing....

Plea Tr. 39.

The Government informed the Court that it had no objection and also confirmed attorney Wagner's understanding that the Court has little discretion by the terms of the statute. In the Government's own words:

> [I]t is true, the government has no objection. The government has no objection to Ms. Smith being released. However, I told Mr. Wagner, and the government will be remiss if we didn't point out to the court that whether the government has any objection or not, it is academic, because under United States Code Title 18, Section 3143, subsection (a)(2), it appears that once a plea of guilty or a person has been found guilty in a case like this, there is no discretion....

Plea Tr. 41.

■ Both attorney Wagner and the Government correctly informed the Court that under 18 U.S.C. § 3143, there is little discretion for the Court to release a defendant pending sentencing. Smith has not successfully attacked the constitutional validity of her plea on this basis.

### b. *substantial assistance*

Second, Smith contends that the Government breached its oral and written promise to move for a downward departure based upon substantial assistance. Smith claims that she was induced to with-

draw her motion to withdraw her guilty plea based on governmental promises.

As a preliminary matter, the written plea agreement did not obligate the Government in this matter to move for a downward departure based upon substantial assistance. The plea agreement provides in relevant part:

> 6. The defendant agrees to cooperate fully and truthfully with the United States, and provide all information known to the defendant regarding any criminal activity. In that regard:
>
> a. The defendant agrees to testify truthfully and completely at any grand juries, trials or other proceedings.
>
> b. The defendant agrees to be reasonably available for debriefing and pre-trial conferences as the United States may require.
>
> c. The defendant agrees to provide all documents, records, writings or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.
>
> d. The defendant agrees that, upon request by the United States, the defendant will voluntarily submit to a government polygraph examination.
>
> \* \* \* \* \* \*
>
> 8. The parties agree that the United States reserves its option to seek any departure from the applicable sentencing guidelines, pursuant to Section 5K of the *Sentencing Guidelines and Policy Statements,* or Rule 35(b) of the Federal Rules of Criminal Procedure, if in its sole discretion, the United States determines that the defendant has provided substantial assistance and that such assistance has been completed.

■ The Fourth Circuit has held that this exact language does not give rise to an enforceable promise as a matter of contract law. *United States v. Wallace,* 22 F.3d 84, 87 (4th Cir.1994). According to

the *Wallace* court, the United States retains discretion to conclude whether the defendant cooperated "fully and truthfully" and whether the assistance given was "substantial." *Id.* Thus, in this case, there was no enforceable promise arising from the plea agreement itself. In its discretion, the Government could refuse to move for a downward departure.

Furthermore, the files and records in this case show conclusively that there were no hidden promises by the Government. At the guilty plea hearing, the Court asked attorney Wagner about the plea agreement:

> Court: Does the plea bargain agreement in this case set forth each and every term[ ] of any agreement negotiated by you with the United States Attorney's office concerning this case?
>
> Wagner: Yes, it does, Your Honor.
>
> Court: Has the defendant been made fully aware of each of those terms?
>
> Wagner: Yes, she has, Your Honor.

Plea Tr. 21.

The Court then asked the Government the same basic question:

> Gov't: It does, Your Honor.

Plea Tr. 22.

The Court then quizzed Smith about what had been discussed:

> Court: Ms. Smith, did you hear and understand the questions I asked of your counsel and of the United States Attorney?
>
> Smith: Yes.
>
> Court: Did you hear and understand their answers?
>
> Smith: Yes, I did.
>
> Court: So far as you know, did they answer correctly?
>
> Smith: Yes, Your Honor.

Plea Tr. 22–23.

The Court asked Smith if, independent of the plea agreement, she had been prom-ised that the Government would move for a reduction of her sentence. Smith indicated that the Government said "it may happen" but that "[n]o promises have been made." Plea Tr. 24. The Court explained the terms of the plea agreement, the role of the Court, and the overall consequences of her plea. Plea Tr. 25–26. After explaining these matters in considerable detail, the Court concluded:

> Court If there has been any agreement that they are going to move for a reduction of sentence, this is the time to tell me about it, because I'm not going to accept your plea if that's a part of the plea bargain.
>
> Smith: No, No promises have been made to me.
>
> Court: No promise has been made.
>
> Smith: No.

Plea Tr. 26.

After the plea hearing, Smith's attorneys filed a motion to withdraw her guilty plea. Subsequent to that, Smith moved to withdraw her motion to withdraw her guilty plea. At the sentencing hearing, the Court asked Smith about her earlier suggestion at the Rule 11 colloquy about a promise of a reduced sentence. Sentencing Tr. 5–6. Smith indicated that her attorneys had told her that there had been a promise for a reduction of sentence in exchange for her cooperation. The exchange went as follows:

> Smith: Indirectly I was told that I would get some type of assistance, but later I am finding out that I wouldn't.
>
> Court: Who told you that?
>
> Smith: My attorney, Robert Wagner.
>
> Court: Did the United States Attorney ever make—anyone from the United States Attorney's office or anyone connected with the prosecution of this case ever suggest to you or indicate to you or make any promise to you that

they would ask the court to give you a reduced sentence other than what was called for by the guidelines?

Smith: No. Not directly to me, no.

Court: Well, do you know whether any such comment to your attorney or anyone connected with your defense in the matter?

Smith: Yes, that comment was made.

Court: All right. And how do you know that?

Smith: Because my attorney told me so.

Court: But you did not hear it?

Smith: No, I didn't.

Sentencing Tr. 6.

The Court read from the guilty plea transcript where Smith had stated that "[n]o promises have been made" to her. *Id.* at 8. The Court also reminded Smith about the terms of the plea agreement and the consequences of pleading guilty. *Id.* at 8–10.

Smith iterated to the Court that there had been an understanding "that I would receive some type of reduction" after she pled guilty. *Id.* at 8. Smith elaborated:

Smith: My responsibilities are to assist the government, and after my assistance that they would be willing to offer me a sentence reduction.

Court: Now, is that the reason that you have withdrawn your motion to withdraw the plea?

Smith: No, that's not the complete reason, no. Because of counsel also.

Court: Was that a part of the reason?

Smith: Yes.

Court: Now, as I understand what you are saying, the United States Attorney's office agreed they would make a motion to the court saying they had no objections to the court going outside of the guidelines. Is that what you said?

Smith: Yes.

Court: And is that the total of any promise or understanding which you have had with them?

Smith: Yes.

Court: No other condition o[r] provision?

Smith: No.

\* \* \* \* \* \*

Court: You [ ] understand that while the United States Attorney may make the motion for a reduction of sentence or it may say it has no objection to reduction of the court going outside of the guidelines, I want you to understand that after time of sentencing the mere fact that they have no objection to the court going outside of the guidelines has no meaning whatsoever because the court could not bring you back for any change of sentencing except upon a motion made by the United States Attorney for cooperation which has occurred since that time. And it's not merely a statement that he has no objection to it; he must make the motion. Otherwise, the court has no authority whatsoever to do it.... Do you understand that?

Smith: Yes, I do.

Court: Now, understanding all of that, are you sure that you want to withdraw your motion to withdraw the plea of guilty which you previously entered?

Smith: Yes.

Court: Other than your statement as to what your counsel has told you that the [government] at a Rule 35 motion will make no objection to the court going outside of the guidelines, other than that statement has there been any offer or any inducement of any kind

made to you in order to have you agree to withdraw your plea of guilty . . . .

Smith: No, sir.

\* \* \* \* \* \*

Court: That's the sole offer that's been made to you?

Smith: Yes.

Court: Well, I want you to understand this: It is absolutely an illegal motion. It has no meaning whatsoever. The court could not act upon it even if it wanted to do so. So if that is any inducement to you to withdraw your motion to withdraw the plea, I want you to understand now that you are wasting your time because it has no meaning whatsoever.

Sentencing Tr. 9–13.

All the parties represented that there was no hidden agreement that the Government would not object to the Court's departure from the Sentencing Guidelines. *Id.* at 19, 24. The Court then made sure this was Smith's understanding and her lawyers' understanding of the situation:

Court: Now, Ms. Smith, do you thoroughly understand what we have been discussing?

Smith: Yes, I do.

Court: Do you understand there is no agreement by the United States Attorney's office, no representation by the United States Attorney's office or indication by the United States Attorney's office that regardless of what cooperation you may give from this day forward that they will make a Rule 35 motion for a reduction of your sentence? Do you understand that?

Smith: Yes, I do.

Court: It is only a hope on your part?

Smith: Right. Yes, your honor.

\* \* \* \* \* \*

Court: And the only promise or indication of any assistance that you would get is your hope that what information you furnish to the prosecution or to the United States Attorney's office or its official will lead them to file the Rule 35 motion. Is that your understanding?

Smith: Yes, Your Honor.

Court: Mr. Robinson, Mr. Wagner, is that your understanding of it, too?

Robinson: It is, Your Honor.

Wagner: Yes, Your Honor.

Sentencing Tr. 20–23.

In the end, Smith's allegation of a hidden oral agreement adds nothing to the original record before the Court and an evidentiary hearing or additional discovery is not warranted. The issue of whether an oral agreement existed was asked and answered in the passing of sentence. All the parties represented that there was no oral agreement separate and apart from the plea agreement. In addition, the Court corrected or clarified an earlier misunderstanding by Smith and cured any possibility of prejudice. *See Lambey,* 974 F.2d at 1394–1395 (attorney's error in advice to his client may be corrected or clarified by the court). In fact, at her guilty plea hearing, the Court warned Smith about her rights under the plea agreement and the collateral results of pleading guilty. When Smith sought to withdraw her motion to withdraw her plea, the Court again admonished Smith about her rights and the implications of withdrawing her motion to withdraw the plea. On both occasions, Smith acknowledged that she understood the Court's statements.

▋ When voluntarily and intelligently made, a criminal defendant's plea of guilty is not a mere tentative decision on whether to proceed to trial. In reviewing this matter, this Court can not ignore the fact that Smith is a college-educated woman who

grew up in a solid, middle class family. At some point, the Court must be able to rely on the representations of a criminal defendant. *See Lambey*, 974 F.2d at 1395. The criminal justice system demands the finality of the process when constitutional safeguards have been followed.[14] *Hartman v. Blankenship*, 825 F.2d 26, 28 (4th Cir. 1987).

### c. Quantity of Drugs

Smith claims that the Government orally promised that she would be held attributable for only 5 to 15 kilograms of crack cocaine. At sentencing, the Court attributed 255 kilograms of crack cocaine to Smith. PSR ¶ 94. Smith argues that the final attribution amounts are in contravention of her purported oral agreement with the Government. Smith's claim is without foundation.

First, the Government flatly denies that it made any such promise for attribution of 5 to 15 kilograms of crack cocaine. Second, the attributable amounts are accurate. At the guilty plea hearing, the Government recited the facts it would seek to prove had the case gone to trial. The Government stated that by the middle of 1990, Hall and other ring members were converting powder cocaine into crack cocaine. Plea Tr. 29. Hall met Smith in May of 1990, and the Government stated that she became romantically involved with Hall in the sum-

mer of 1990. Plea Tr. 30; PSR ¶ 94. The Government also stated that during the life of the conspiracy, over 200 kilograms of crack cocaine were distributed. Plea Tr. 29. After the Government's recitation of the facts, the Court asked Smith whether the facts had been stated correctly and Smith indicated that they were. Plea Tr. 39–40.

Third, there has been no prejudice from an alleged breach of an oral promise. U.S.S.G. § 2D1.1(c)(1) provides for a base level of 38 for 1.5 kilograms or more of cocaine base, or crack cocaine. Thus, a finding that Smith is responsible for 5 to 15 kilograms, rather than 255 kilograms of crack cocaine has no effect on the applicable guideline range.

■■■ Smith insists that she would have been eligible for a reduction under U.S.S.G. § 3B1.2(a) as a minimal participant if she were attributed with 5 to 15 kilograms of crack cocaine. The plain facts contradict this assertion. Smith was certainly not the drug kingpin in the cocaine network. Yet her involvement in the network was direct and extensive. Smith obtained apartments for herself and Hall under false names; she made drug and cash runs to New York City; she manufactured fraudulent birth certificates for drug ring members; she posted bond for Hall;

---

**14.** This Court notes that Smith has not offered any evidence suggesting that the Government's refusal is irrational to any legitimate governmental end or is based on a discriminatory motive. *See Wade v. United States*, 504 U.S. 181, 186, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992). Indeed, the Government makes a determination based on whether the informant has complied "fully and truthfully" and whether such assistance has been "substantial." Prior to sentencing, Smith did not provide complete, truthful, and substantial information to the Government. Before she was indicted, Smith met with federal agents on June 28, 1993. Smith failed to provide federal agents with information concerning the activities of the cocaine network. Smith lied to federal agents and told them that she did not know Wainsworth Hall and that she knew nothing

about Derrick Taylor's murder. Smith reported to Peter Hall after her meeting and reported on what the agents knew about the ring.

Smith was subsequently indicted. After her initial appearance in this matter, Smith and her attorney Wagner met with federal agents on September 30, 1994. At that meeting, Smith failed to disclose Peter Hall's location in Seattle. Smith knew that Peter Hall was living there under the alias Curtis Lamont Saunders. Sentencing Tr. 103–104, 125–26. On October 1, 1994, Hall was found dead at his apartment in Seattle. Only then, Smith met with federal authorities a second time and disclosed Hall's whereabouts and provided information about him. The Government indicates that the information Smith provided then and in subsequent meetings did not amount to substantial assistance.

she used aliases for other ends of the drug conspiracy; she lied to authorities about Hall's whereabouts and the scope of the conspiracy; she reported to Hall about what federal agents knew about the drug ring; she provided a "getaway" car to Hall when he was evading arrest for the murder of Derrick Taylor; she removed incriminating evidence at an apartment she shared with Hall in Charlotte, North Carolina; and she fled the jurisdiction and became a fugitive with Hall after an indictment had been returned against them. In sum, Smith was involved in the drug ring, and her involvement was substantial. The actual amount of crack cocaine in this instance does not alter that determination or Smith's overall sentence.

### d. Information Provided by Smith

Smith contends that the Government breached the terms of the plea agreement and used information provided by Smith to enhance her sentence. *See* Plea Agreement, at ¶ 7. Smith has made this blanket assertion without any evidentiary support. This claim must be dismissed.

### 3. Excessive and Unlawful Sentence

Smith claims that her sentence was unlawful and excessive and therefore in violation of her due process rights. In particular, Smith contends that the Court erred in (a) calculating the quantity of drugs; (b) awarding her a two-level enhancement for obstruction of justice; (c) failing to depart downward based on coercion and duress; (d) failing to grant a reduction based on a minimal or mitigating role; and (e) assessing a two-level enhancement for possession of a firearm.

Smith failed to raise these issues on direct appeal and may not collaterally attack them unless she can overcome procedural default. *Frady,* 456 U.S. at 165, 102 S.Ct. at 1593. Smith waived her right to appeal her sentence and such excuse may not be sufficient cause to carve an exception to the procedural default rule. *Pipitone,* 67 F.3d at 37–38; *Jones,* 56 F.3d 62,

1995 WL 321263, at *1. After reviewing the record and files in this matter, this Court finds that there was no actual prejudice and no errors amounting to a fundamental miscarriage of justice. *See Davis,* 417 U.S. at 346, 94 S.Ct. at 2305.

Also, this Court notes that a district court's technical application of the Sentencing Guidelines does not necessarily give rise to a constitutional issue. *United States v. Vaughn,* 955 F.2d 367, 368 (5th Cir.1992). The sentence imposed in this matter is well within the statutory limit and is therefore insulated from section 2255 review. *Fernandez v. United States,* 941 F.2d 1488, 1494 (11th Cir.1991); *Vaughn,* 955 F.2d at 368; *United States v. Patterson,* 739 F.2d 191, 196 (5th Cir. 1984); *United States v.. Rowland,* 848 F.Supp. 639, 642 (E.D.Va.1994).

### 4. Discrepancy in Penalties for Cocaine Base and Cocaine Powder

Smith argues that the disparity of sentences imposed for offenses involving crack cocaine and powder cocaine is unconstitutional. Smith contends that the relevant provisions of 21 U.S.C. § 841 and the Sentencing Guidelines are unconstitutionally vague and ambiguous, and the distinction in sentencing lacks a rational basis and has a disparate impact on racial minorities in violation of the Equal Protection Clause.

The Fourth Circuit has consistently rejected Smith's claim. *United States v. Burgos,* 94 F.3d 849, 876–877 (4th Cir. 1996) (en banc); *United States v. Fisher,* 58 F.3d 96, 99–100 (4th Cir.1995); *United States v. Jones,* 18 F.3d 1145, 1151 (4th Cir.1994); *United States v. D'Anjou,* 16 F.3d 604, 612 (4th Cir.1994); and *United States v. Thomas,* 900 F.2d 37, 39–40 (4th Cir.1990). Therefore, Smith's claim must be rejected.

### 5. Ineffective Assistance of Counsel

Smith alleges that her counsel were ineffective during all stages of her proceed-

ings. A client is entitled to "reasonably effective assistance" by her attorney. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). If claiming ineffective assistance, a petitioner must demonstrate that she received deficient legal representation and suffered actual prejudice from such representation. *Poyner v. Murray*, 964 F.2d 1404, 1425 (4th Cir.1992). The burden is on the petitioner to show that "absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland* 466 U.S. at 695, 104 S.Ct. at 2069.

### a. Guilty Plea

▬ Smith asserts that she was denied reasonably effective representation at the guilty plea phase of her proceedings. In cases involving guilty pleas, a defendant must show that her counsel's representation was deficient and she would not have pled guilty but for her lawyer's inadequate representation. *See Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Fields v. Attorney Gen.*, 956 F.2d 1290 (4th Cir.1992).

### 1. Competency

▬ Smith asserts that her lawyers were ineffective in failing to ask the Court to conduct a competency determination. Smith requests an evidentiary hearing and has submitted certain discovery requests. Due process requires that a defendant be legally competent before entering a plea of guilty. *Shaw*, 733 F.2d at 314. The guilty plea is rendered invalid if the defendant's mental faculties were so impaired that the defendant could not appreciate the charges and consequences of her plea, and could not comprehend her constitutional rights. *Id.*

▬ Smith's arguments do not raise any factual disputes and therefore there is no need for an evidentiary hearing or discovery. The original record shows that Smith was not legally incompetent at her guilty plea hearing. At the hearing, the Court asked Smith and her trial counsel whether she understood the nature of the charges against her and her constitutional rights. The Court asked Smith and her trial counsel whether she understood the consequences of her plea and whether she was acting voluntarily. The Court asked Smith and her trial counsel about her understanding of the plea agreement and about any possible defenses. Smith provided coherent answers to the Court's questions and was in control of her faculties during the plea hearing. *See* Plea Tr. 6–40. The Court inquired about Smith's state of mind and her competency and Smith stated that she had never suffered from mental illnesses of any kind. Plea Tr. 17. Although Smith's treating psychologist testified at sentencing that Smith had been depressed around the time of her arrest, her psychologist also pointed out that Smith had become a much "healthier person" from that time forward. Sentencing Tr. 171–172. Accordingly, Smith's lawyers were not deficient in their representation when the facts and circumstances did not call into question Smith's legal competence.

### 2. Direct and Collateral Consequences of Pleading Guilty

Smith next argues that her lawyers failed to advise her about the direct and collateral consequences of pleading guilty. Smith maintains that her counsel failed to tell her about a possible and likely sentence, parole eligibility, and about the ability to withdraw her plea once she entered it. Smith also claims that her attorneys misled her and told her that she would receive a lenient sentence.

▬ An attorney must correctly inform the defendant of the direct consequences of her plea. *Manley v. United States*, 588 F.2d 79 (4th Cir.1978); *Hammond v. United States*, 528 F.2d 15 (4th Cir.1975). Professional standards indicate that legal counsel should outline the terms of a proposed plea to his client. *Jones v.*

*Murray,* 947 F.2d 1106 (4th Cir.1991). Legal counsel should provide an opinion on probable outcomes and should advise his client as to the strengths and weaknesses of possible alternatives. *Id.* In some instances, legal counsel's gross misinformation on the indirect consequences of the plea may constitute ineffective assistance. *Strader v. Garrison,* 611 F.2d 61 (4th Cir. 1979).

 Even so, an attorney's "bad guess" as to sentencing does not render a guilty plea involuntary. *Little v. Allsbrook,* 731 F.2d 238, 241 (4th Cir.1984). Additionally, an attorney's error in advice to his client may be corrected by the court at a subsequent hearing. *Lambey,* 974 F.2d at 1394–1395. The court may correct or clarify the earlier erroneous information by the defendant's lawyer. *Id.* When the court informs the defendant that her likely sentence is not capable of prediction and the defendant so acknowledges, a guilty plea is not rendered involuntary by virtue of an attorney's bad estimate of the likely sentence. *Id.*

In this case, the record of the guilty plea hearing shows that the Court explained the factual basis of Smith's plea and provided Smith with an opportunity to respond. Smith admitted that she had read and understood the plea agreement and the indictment. The Court informed Smith about her rights under the plea agreement including the waiver of the right to appeal and about the maximum statutory penalties, fines, and supervised release terms for the offenses listed in the indictment. The Court also informed Smith about her constitutional rights and admonished Smith about the consequence of entering a plea. Smith acknowledged that she understood the Court's comments. In addition, the Court warned Smith that her final sentence could not be predicted and Smith acknowledged that she understood that to be the case. The Court questioned Smith about whether anyone had advised her about what sentence she would receive:

Court: Has anyone told you what punishment you are going to receive in this case? Not what you can receive, but has anyone told you what punishment is going to be in this case?

Smith: No, they haven't.

Plea Tr. 10.

At the sentencing hearing, the Court fully questioned Smith on her reasons for withdrawing her motion to withdraw the guilty plea. The Court explained to Smith the consequences of withdrawing her plea. Smith admitted to understanding the Court's advice. Smith and her lawyers both acknowledged the same understanding of the consequences of withdrawing the motion.

The record and files in this matter do not show that the advice received fell below the range of competence demanded of criminal attorneys. There is no direct evidence that Smith was provided with erroneous legal advice. Moreover, the Court cleared up any misunderstanding on the part of Smith during the plea hearing and sentencing hearing. Once explained by the Court, Smith showed an understanding of the plea bargain and the rights and consequences of taking a plea. In the context of her family background and education, there can be no doubt but that Smith understood the ramifications of her decision.

### 3. Factual and Legal Investigation

 Smith contends that her lawyers failed to conduct a reasonable and independent investigation of her role in the drug conspiracy. In this respect, Smith argues that her lawyers unduly relied on factual information compiled by the Government. Smith maintains that her lawyers failed to file any pre-trial motions and did not adequately investigate alternative defenses such as coercion or duress. An attorney has a duty to make a reasonable factual and legal investigation on behalf of his client. *Sneed v. Smith,* 670 F.2d 1348 (4th

Cir.1982). The reasonableness of the investigation is evaluated based on the totality of the circumstances facing the attorney. *Bunch v. Thompson,* 949 F.2d 1354 (4th Cir.1991).

■ Smith's claim that her lawyers failed to conduct a reasonable investigation is not supported by affidavits or other evidence. The records and transcripts in this case clearly show that Smith's lawyers were well-informed on the facts surrounding this matter. The guilty plea hearing transcript also reveals that Smith's lawyer Wagner investigated a mitigating defense of duress or coercion. Plea Tr. 36. Attorney Wagner informed the Court that such defense would "become critical at the sentencing here, that Kem Smith was beaten by Peter Michael Hall, beaten regularly by him, and that's one of the reasons that she did what he told her to do, because she feared him." Plea Tr. 36. There is no need for an evidentiary hearing or discovery on this issue where Smith's unsupported allegations are contradicted by the original record.

Nevertheless, Smith contends that her lawyers should have surmised that evidence of duress or coercion supported a complete defense.[15] With psychiatric defenses, the Fourth Circuit has held that trial counsel's failure to explore an insanity defense amounts to ineffective assistance when counsel's action was unreasonable and there was a reasonable probability that the defense would succeed. *Becton v. Barnett,* 920 F.2d 1190 (4th Cir.1990).

■ In this case, the lawyers' tactical decision to present evidence of battered woman's syndrome as a mitigating defense was eminently reasonable and prudent. The Fourth Circuit has not directly ruled on the issue of battered woman's syndrome evidence. Nonetheless, Smith's lawyers were guided by case precedent from other circuits which suggests that the proper place for such evidence is at sentencing. *United States v. Willis,* 38 F.3d 170, 174–177 (5th Cir.1994); *United States v. Johnson,* 956 F.2d 894, 898–907 (9th Cir.1992). Indeed, battered woman's syndrome evidence relies on the subjective feelings of the defendant. *Id.* Thus, such evidence is not relevant in determining guilt or innocence, but it may be helpful in determining an actual sentence. *Id.; see also United States v. Smith,* 987 F.2d 888, 890–891 (2d Cir.1993) (subjective evidence not relevant to duress defense in terms of criminal liability). Without explicit guidance from the Fourth Circuit on a novel issue of law, Smith's lawyers chartered a prudent course of action.

■ Additionally, Smith's lawyers reasonably concluded that the evidence did not meet the elements for a complete defense of duress. In order to establish a claim of duress, the defendant must show that: (1) she acted under an immediate threat of serious bodily injury; (2) she had a well-grounded belief that the threat would be carried out; and (3) she had no reasonable opportunity to avoid violating the law and the threatened harm. *See United States v. King,* 879 F.2d 137, 138–139 (4th Cir.1989). On the facts of this case, Smith did not have an affirmative defense of duress. It is not sufficient that Smith felt a generalized fear of serious bodily harm if she did not commit certain offenses. *See United States v. Sixty Acres in Etowah County,* 930 F.2d 857, 860–861 (11th Cir.1991). Smith was not acting under fear of imminent harm when she violated numerous federal laws. She could have discontinued her criminal activity and avoided the feared injury. Therefore, Smith's lawyers sought a downward adjustment in Smith's sentence at the sentencing phase of the proceedings. The attorneys' strategic decision did not fall below the bar of reasonable legal competence. When the alternative legal strategy is reasonable, as is the case here, this Court will not engage in Monday morning

**15.** This allegation has also been discussed in section 1(b) of this opinion.

quarterbacking to second guess counsel's legal tactics.

### 4. Government Promises

Smith claims that her lawyers failed to incorporate oral promises made by the Government into the plea agreement. In Smith's view, there was an oral agreement for the Government to file a substantial assistance motion, for Smith to be released on bond pending sentencing, and for there to be an attribution amount of 5 to 15 kilograms of crack cocaine.

There is no merit to this claim. As discussed throughout this opinion, there were no oral promises apart from the written plea agreement. At the guilty plea hearing and at sentencing, the Court conducted an exhaustive inquiry to determine whether there were any oral agreements. The defense lawyers, the Government, and Smith all acknowledged that no promises had been made. There is no reason to conduct an evidentiary hearing or allow discovery on this issue. Smith has not submitted affidavits or other documentary evidence and has relied on the original records, files and transcripts in support of her claim. The original record conclusively shows that this matter was settled at Smith's guilty plea hearing and at sentencing. Given her family background and education level, Smith understood the charges against her and fully acknowledged the consequences of pleading guilty. No additional facts have been alleged necessitating a second hearing on this matter.

### b. *Withdrawal of Guilty Plea*

■ Smith claims that her lawyers' advice to withdraw her motion to withdraw her guilty plea was erroneous and unreasonable. Smith argues that her lawyers unduly relied on an oral promise by the Government to file a substantial assistance motion or not to oppose a motion to depart

from the Sentencing Guidelines. In some situations, legal counsel's erroneous advice on whether to withdraw the guilty plea may constitute ineffective assistance. *United States v. DeFreitas*, 865 F.2d 80, 82 (4th Cir.1989); *United States v. Moore*, 931 F.2d 245, 248 (4th Cir.1991). Generally speaking, there must be a reasonable probability that but for counsel's errors, the defendant would have pleaded not guilty and proceeded to trial. *Id.*

The files and transcripts in this case show that Smith's lawyers did not provide erroneous advice to their client. In response to the Court's questions, all the parties acknowledged that Smith merely hoped to receive a reduction in her sentence if she provided full, truthful, and substantial assistance. All the parties conceded that there was no oral understanding apart from the written plea agreement. For the sake of clarification, the Court asked Smith about her earlier statements at the Rule 11 colloquy concerning promises of leniency and the like. Smith indicated that her attorneys had told her that there had been such promises. Sentencing Tr. 6. The Court refreshed Smith's recollection by reading from the plea hearing transcript where Smith had stated that no promises had been made to her. *Id.* at 7–10. The Court also reminded Smith about the consequences of accepting a plea in relation to a motion for a reduced sentence. Sentencing Tr. 10–13. In that regard, the Court warned Smith of different consequences than what she indicated to be the case. *Id.*

After clarifying or correcting Smith's misunderstanding, the Court made sure that she wished to proceed with her motion to withdraw the motion to withdraw the guilty plea.[16] *Id.* Smith stated that she understood the Court's comments and wished to withdraw her motion. *Id.* Defense counsel and the Government agreed

---

**16.** The excerpts from this dialogue are provided in the statement of facts and under section 2(b) of this opinion.

with this clarified understanding and reiterated that there were no hidden agreements. *Id.* If there had been a prior event or advice, the Court untangled any misunderstanding on Smith's part. *See Lambey,* 974 F.2d at 1394–1395. Smith has not suffered any prejudice from alleged poor lawyerly advice. In the context of her family background and educational level, Smith understood the ramifications for withdrawing her motion. For this reason, Smith's request for an evidentiary hearing and discovery must be rejected. Smith has not raised any factual issues that, if true, would entitle her to relief and thereby require an evidentiary hearing or discovery.

### c. Sentencing

Smith claims that her lawyers rendered ineffective assistance at sentencing. Smith contends that her lawyers failed to raise objections to the presentence report either by filing written objections or by making objections at the sentencing hearing.

■■■ A defendant is entitled to reasonably competent legal assistance at sentencing proceedings. Ineffective assistance may exist when counsel fails to object to an improper application of the

Guidelines or to clear errors in the presentence report. *United States v. Breckenridge,* 93 F.3d 132, 135–136 (4th Cir. 1996); *Smith v. United States,* 871 F.Supp. 251, 255–256 (E.D.Va.1994). Similarly, counsel may be ineffective if he fails to present mitigating evidence at sentencing. *Deutscher v. Angelone,* 16 F.3d 981, 984 (9th Cir.1994); *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.1991). A sentence imposed without such assistance must be vacated and reimposed to permit mitigating evidence to be fully and freely developed. *See Breckenridge,* 93 F.3d at 135–136; *United States v. Burkley,* 511 F.2d 47 (4th Cir.1975).

In this matter, a presentence report was prepared and distributed to the parties. On December 16, 1994, attorney Wagner advised the probation officer of certain objections. Wagner also filed written objections on December 29, 1994 incorporating his earlier objections and raising other objections. Attorney Robinson also noted objections to the report and filed his own written objections on December 30, 1994.

■■ Taken together, defense counsel's objections were comprehensive in scope.[17] Among the major objections raised, first, defense counsel argued that Smith should be attributed with 5 kilograms of crack

---

17. Indeed, besides the objections outlined above, defense counsel objected to the reference that Smith was a member of a conspiracy or participated in any act that would further the conspiracy. *See* PSR ¶ 14. In this regard, defense counsel claimed that Smith's knowledge, actions, and intentions were dictated by Peter Hall. Defense counsel objected to the reference that Smith was knowledgeable of Peter Hall's cocaine network prior to September 1991. *See* PSR ¶ 25. Defense counsel objected to the fact that Smith had typed a false birth certificate as a means to further the conspiracy. *See* PSR ¶ 48. Defense counsel objected to the suggestion that Smith was aware that money and drugs were concealed in a hidden compartment in a vehicle she and another individual drove from New York to Charlotte, North Carolina in the summer of 1992. *See* PSR ¶ 49. Defense counsel objected to the suggestion that Smith obtained a false driver's license in order to conceal her true identity or to further the

ends of the conspiracy. *See* PSR ¶ 58. Defense counsel objected to the notion that Smith contacted her attorney in Richmond, Virginia in an effort to find out what information law enforcement agents had gathered against Peter Hall and the ring. *See* PSR ¶ 63. Defense counsel objected to the notion that Smith was aiding Peter Hall's effort to evade law enforcement after the murder of Derrick Taylor when Smith delivered an Acura automobile to Hall. *See* PSR ¶ 64. Defense counsel objected to the suggestion that Smith met with law enforcement agents in June 1993 solely to gather information on behalf of Peter Hall. *See* PSR ¶ 66. Defense counsel objected to the suggestion that Smith had fled her parents' home after learning that the original indictment had been returned by the Grand Jury. *See* PSR ¶ 70. Finally, defense counsel objected to the suggestion that Smith acquired vehicles utilized in the conspiracy. *See* PSR ¶¶ 74 & 84.

cocaine, rather than 255 kilograms, based on her alleged dates of involvement in the drug conspiracy. Second, defense counsel argued that Smith should be attributed with only $3,000 in laundered money, rather than more than $1,000,000, based on her limited involvement in the conspiracy. Third, defense counsel asserted that Smith should be awarded at least a two level reduction under U.S.S.G. § 3B1.2(b) for her minor role in the ring. Fourth, defense counsel maintained that Smith should not be given an enhancement under U.S.S.G. § 3C1.1 for obstruction of justice or an enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon. Fifth, defense counsel claimed that Smith should be given a reduction for duress or coercion under U.S.S.G. § 5K2.12. Accordingly, Smith's lawyers provided reasonably competent assistance on this aspect of sentencing.

At the sentencing hearing, Smith's lawyers called on lay witnesses and expert witnesses, and the lawyers introduced medical records and other documentary records in support of a mitigating defense based on coercion or duress under U.S.S.G. § 5K2.12. Defense counsel called expert psychologists to testify about battered woman's syndrome and how the theory applied to Smith's case.[18] Defense also called numerous members of the community to provide mitigating testimony. Such community members included the former mayor of Richmond, Virginia.

At the hearing, Smith's lawyer Robinson did make factual concessions to earlier written objections to the presentence report. Sentencing Tr. 220–222. Thus, Robinson conceded the fact that Smith was in possession of a firearm and had obstructed justice in relation to U.S.S.G.

§ 2D1.1(b)(1) and U.S.S.G. § 3C1.1. The records, files and transcript demonstrate unequivocally that Smith was in possession of a dangerous weapon and had obstructed justice. Indeed, at the guilty plea hearing, the Government recited the facts it would have sought to prove had Smith's case gone to trial. The Government's recitation included such facts as Smith's possession of a firearm and Smith's obstruction of justice by virtue of false statements and omissions to federal authorities. Plea Tr. 32, 34–35. When asked whether the Government had stated the facts correctly, Smith indicated that such was the case. Plea Tr. 39–40.

As to other written objections, Robinson did not specifically raise the objections at the sentencing hearing, but instead he treated them in the context of a duress or coercion defense. Sentencing Tr. 220–222. Among the objections, defense counsel had filed an objection to the attribution amount of 255 kilograms of crack cocaine. Defense counsel argued that Smith did not become involved in the conspiracy until 1992 and should be accorded an attribution amount as low as 5 kilograms. In addition, defense counsel had filed an objection to the attribution of more than $1,000,000 in laundered funds. Defense counsel had argued that Smith should only be attributed with $3,000 in laundered funds.

Smith's lawyers provided reasonably competent representation in the context of the situation. Defense counsel had already provided the Court with their written objections to the presentence report. The Court had an opportunity to review those written objections well in advance of the sentencing hearing. Defense counsel made a prudent decision to put forward mitigating evidence of duress and coercion

---

**18.** Smith maintains that her lawyers failed to prepare the psychologists for the sentencing hearing. Smith's main argument is that Dr. Twining had not evaluated Smith prior to the hearing. The lawyers' tactical decision was mainly to use Dr. Twining to explain battered woman's syndrome theory. Defense counsel called Dr. Wilson, who was Smith's treating psychologist, to testify about Smith's mental condition. This Court can not conclude that the lawyers' actions fell below the threshold of reasonably competent representation. This Court also points out that Smith is not constitutionally entitled to the effective assistance of a psychiatrist expert. *See Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998).

and make all of their arguments in the context of that defense. This Court may not impose the benefit of hindsight and conclude that since the strategy did not work, the lawyers' decision fell below the threshold of reasonable legal competence.

 Most important, Smith has suffered no actual prejudice from her criminal lawyers' action. As to the drug attribution amounts, the facts show that Smith became involved with Hall in May of 1990. PSR ¶ 94. In the spring of 1990, the drug network began to convert cocaine powder to crack cocaine. PSR ¶ 14. At the guilty plea hearing, the Government recited the facts it would seek to prove had the case gone to trial. The Government stated that the drug conspiracy was responsible for over 200 kilograms of crack cocaine. When asked whether the Government's version of the facts was true and correct, Smith responded that it was. Plea Tr. 29–30.

In this case, U.S.S.G. § 2D1.1(c)(1) provides for a base offense level of 38 for conspiracy to distribute 1.5 kilograms or more of crack cocaine. Defense counsel had sought an attribution amount of 5 kilograms of crack cocaine. Either way, the difference in attribution amounts would have no material effect on the calculation of Smith's sentence. Smith would not have been eligible for a downward adjustment as a minor figure in the conspiracy based on lower drug amounts alone. The facts clearly show that Smith's involvement in the drug operation was substantial.

As to the laundered amounts, Smith's lawyers had argued that Smith should only be attributed with $3,000 in laundered funds. U.S.S.G. § 2S1.1(b)(2)(F) provides for a five point enhancement for value of funds of more than $1,000,000. Smith's money laundering conviction of sixty months runs concurrently with her drug conspiracy conviction of two hundred ninety-four months. The enhancement has had no material effect on the term of Smith's sentence. Moreover, there is a serious question whether the imposition of sentence would have been altered without the enhancement. The maximum statutory penalty for money laundering is 5 years or 60 months. *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) and 371. The Sentencing Guidelines call for an imprisonment range of 78–97 months based on Smith's criminal history and offense level (28/I), and if the value of funds is more than $1,000,000. Since the statutory maximum was sixty months, the Court only imposed a sixty month sentence in this matter. Without the five level enhancement for laundered funds of more than $1,000,000, the Sentencing Guidelines call for a sentence ranging from 46–57 months. The three month differential between the statutory maximum (60 months) and the high end of the guideline range (57 months) is negligible.

#### d. *Conflict of Interest*

Smith asserts that her lawyers were laboring under a conflict of interest and therefore rendered ineffective legal assistance. In particular, Smith argues that her attorney Wagner was operating under a conflict of interest because Wagner and the Assistant United States Attorney, Fernando Groene, had worked as Assistant Commonwealth Attorneys in Arlington County, Virginia. *See* Detention Tr. 5. Also, Smith argues that her attorney Robinson was operating under a conflict of interest in his prior representation of William Foreman, who was an unindicted co-conspirator and governmental informant, and in his prior representation of Wainsworth Hall.

 Criminal defendants are entitled to the undivided loyalty of competent counsel. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The possibility of a conflict of interest does not necessarily impinge on a defendant's constitutional rights. *Cuyler*, 446 U.S. at 346, 100 S.Ct. 1708; *Magini*,

973 F.2d at 264. Rather, the defendant must show that an actual conflict of interest existed and the conflict prejudiced counsel's performance. *Id.* Conflicts normally occur when an attorney represents multiple clients, although conflicts may occur with regard to prior representation of a client. *See Hoffman v. Leeke,* 903 F.2d 280, 285–286 (4th Cir.1990). A conflict may also arise when the attorney's "private interests" diverge with those of his client. *Magini,* 973 F.2d at 264.

■ Nonetheless, a criminal defendant may waive the right to conflict-free representation. *Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708; *Bridges v. United States,* 794 F.2d 1189, 1193 (7th Cir.1986). As with the waiver of any constitutional right, the waiver must be voluntarily, knowingly, and intelligently made. *Bridges,* 794 F.2d at 1193. The waiver may be valid even though the defendant does not have specific knowledge or all the implications of such waiver. *Bridges,* 794 F.2d at 1194.

■ In this case, the facts demonstrate a valid waiver of Smith's right to conflict-free representation in regard to attorney Robinson. At the January 30, 1995 hearing, the Government objected to Robinson's representation of Smith. The Court allowed the Government to question Smith and make sure that she desired to give up her right to conflict-free representation. The Government informed Smith that Robinson represented William Foreman and probably had asked him about the offenses he allegedly committed. Hearing Tr. 16–17. The Government made sure that Smith understood that Robinson may have known about Hall and Wainsworth Hall's drug trafficking activities. *Id.* at 17. The Government made sure that Smith understood that Robinson had previously represented Wainsworth Hall. *Id.* Finally, the Government made sure that Smith understood that during the course of his prior representation, Robinson may have learned about events that directly implicated her. *Id.* at 17–18. The Government's questioning concluded as follows:

Gov't: And do you understand that in the course of that representation Mr. Robinson might find out something which directly implicates you in this case?

Smith: Yes, I understand.

Gov't: You understand that the Sixth Amendment to the Constitution of the United States provides that you have a right to the effective assistance of counsel and that that effective assistance means that your counsel, your lawyer, must not— shall not have any conflict of interest?

Smith: I understand that, yes.

Gov't: And that you can waive that conflict after you are knowingly, voluntarily, and intelligently advised of the possibility of a conflict of interest?

Smith: I understand.

Gov't: Do you want to continue these proceedings with Mr. Robinson as a lawyer, even if he might have information regarding your criminal activity in this case?

Smith: Yes, I would like to continue.

Hearing Tr. 18.

At sentencing, the Court reminded Smith that she had waived her right to conflict-free representation:

Court: At that time I believe you said you had no objection at all to his appearing, that you waived any right that you might have as to any conflict that might result. Do you remember that?

Smith: Yes.

Court: Now, . . . do you have any objection today to his participating in the sentencing?

Smith: No, I do not, Your Honor.

Court: Do you want him to participate in the sentencing?

Smith: Yes, I do.

Court: Even though it should appear at some subsequent time that someone suggests there was a conflict of interest on his part, you want to waive any right to raise that as an objection to anything that occurs during the time of sentencing?

Smith: Yes, I do.

Sentencing Tr. 27–28.

The uncontroverted facts show that Smith voluntarily, knowingly, and intelligently waived her right to conflict-free counsel in regard to attorney Robinson. Criminal defendants have no inherent right to disavow their earlier statements when, as here, appropriate procedures have been followed.

■ Furthermore, attorney Wagner was not operating under a conflict of interest in this case. The record merely shows that Wagner and Assistant United States Attorney Groene had been Assistant Commonwealth Attorneys in Arlington County, Virginia. Without affidavits or other evidentiary support, however, Smith alleges that an evidentiary hearing and certain discovery are required to determine whether Wagner unduly relied on promises made by Groene.

Collateral proceedings are not an invitation to manufacture issues of fact where none truly exist. The pedestrian facts are that Smith's defense lawyer and the Assistant United States Attorney once worked in the same office. The records and transcripts unambiguously show that there were no secret promises or oral agreements between any parties in these proceedings. Additional discovery and an evidentiary hearing add nothing to the original record and are unwarranted.

### III. Conclusion

Ms. Smith was advised time and again by the trial judge of the consequences of her decisions. She affirmatively and intelligently chose a particular course of action, and once her plea of mercy was not favorably received, she desired to reverse and change that course. Every defendant desires a lesser sentence. The finality of judgments requires the court to be wary of rejudging matters previously adjudicated unless clearly unconstitutional. The constitutional safeguards were scrupulously adhered to by the trial judge in this case. Accordingly, Smith's motion under 28 U.S.C. § 2255 is **DENIED**.

Smith is **ADVISED** that she may appeal from this final order by forwarding a written notice of appeal and a new application to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days of the date of this Order.

The Clerk is **DIRECTED** to mail a copy of this Order to Smith and to the United States Attorney, Eastern District of Virginia, World Trade Center, Suite 1800, 101 West Main Street, Norfolk, Virginia 23510.

**IT IS SO ORDERED.**